HIPSAVER, INC. *vs.* DOUGLAS KIEL.

Norfolk. November 5, 2012. - March 13, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Practice, Civil,* Summary judgment. *Libel and Slander. Commercial Disparagement. Damages,* Libel.

Discussion of the framework for analyzing a cause of action for commercial disparagement. [522-524]

In a civil action brought by the plaintiff (a corporation engaged in the design, manufacture, and sale of hip protectors), alleging a claim for commercial disparagement arising from the publication of an article in a medical journal regarding the efficacy of hip protectors, the judge did not err in granting summary judgment in favor of the defendant (a doctor who conducted the clinical trial that formed the basis for the article and was its lead author), where the plaintiff, although having a reasonable expectation of proving a likelihood that the defendant recognized or should have recognized that publication of the article was likely to result in pecuniary harm to the plaintiff [534-535], nonetheless failed to demonstrate that it had a reasonable expectation of proving any of the remaining essential elements of a cause of action for commercial disparagement, i.e., that any purported design defects in the clinical trial, which were acknowledged by the defendant in the article, rendered the challenged statements false [524-526]; that the challenged statements, which referred to the inefficacy of hip protectors in general, were "of and concerning" the plaintiff's specific product [526-529]; that the defendant, who candidly discussed in the article the underlying flaws in and limitations of the clinical trial, entertained serious doubts about the truth of the challenged statements [529-534]; or that, as a direct and immediate consequence of the widespread dissemination of the challenged statements, the plaintiff suffered pecuniary loss that was not attributable to other causes [535-542].

CIVIL ACTION commenced in the Superior Court Department on February 15, 2008.

The case was heard by *Barbara A. Dortch-Okara,* J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert LeRoux Hernandez* (*Mark Booker* with him) for the plaintiff.

*Robert P. Powers* for the defendant.

*Thomas F. Maffei, Scott McConchie, Paul G. Cushing, & Kaitlyn L. Dunn,* for Massachusetts General Hospital & others, amici curiae, submitted a brief.

SPINA, J. The present action concerns a claim for commercial disparagement arising from the publication of an article in the Journal of the American Medical Association (JAMA).[1] The plaintiff, HipSaver, Inc. (HipSaver), is a Massachusetts corporation engaged in the design, manufacture, and sale of hip protectors, a device that provides protective padding over the wearer's hip bones in order to reduce the risk of hip fractures in the event of a fall. On July 25, 2007, JAMA published an article entitled "Efficacy of a Hip Protector to Prevent Hip Fracture in Nursing Home Residents: The HIP PRO Randomized Controlled Trial" (article). According to the article, the "Hip Impact Protection PROject (HIP PRO) was designed to test the efficacy of a biomechanically tested energy-absorbing/shunting hip protector in reducing hip fracture incidence among nursing home residents." The article was authored by nine individuals, including the defendant, Dr. Douglas P. Kiel, an associate professor at Harvard Medical School, who conducted the clinical trial that formed the basis for the article and was its lead author. The article described the clinical trial, analyzed the data collected, and concluded, among other things, that the clinical trial "confirm[ed] the growing body of evidence that hip protectors are not effective in nursing home populations."

On February 15, 2008, HipSaver filed a complaint in the Superior Court against Kiel, alleging that he had disparaged HipSaver's product in the JAMA article and was liable for monetary damages.[2] A judge denied Kiel's motion to dismiss the complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). After the completion of discovery, Kiel filed a motion for summary judgment on April 19, 2011, asserting that

---

[1]The tort of "commercial disparagement" also is known as "injurious falsehood," "disparagement of property," "slander of goods," and "trade libel." *First Act Inc.* v. *Brook Mays Music Co.*, 429 F. Supp. 2d 429, 432 n.1 (D. Mass. 2006). For purposes of this decision, we use the terms "commercial disparagement" and "injurious falsehood" interchangeably.

[2]HipSaver sued only Kiel because, as lead author, he assumed full responsibility for the integrity of the clinical trial and the accuracy of the data.

HipSaver had no reasonable expectation of proving the essential elements of its claim, including falsity and special damages. Following a hearing, the judge allowed the motion and dismissed HipSaver's complaint. We granted HipSaver's application for direct appellate review. Because we conclude that the judge properly entered summary judgment for Kiel where HipSaver failed to demonstrate that it had a reasonable expectation of proving all of the essential elements of a cause of action for commercial disparagement, we affirm.[3]

1. *Background.* We briefly summarize the undisputed facts contained in the summary judgment record, reserving additional facts for later discussion in conjunction with specific issues.

HipSaver was incorporated in 1995 and is one of at least twenty-three companies that markets hip protectors. There are two varieties of the device, one designed to divert the energy of a fall (hard shell type) and another designed to absorb the energy of a fall (foam type). HipSaver's product is made of "soft pen cell foam." Its customer base is, and always has been, long-term care facilities, and its largest client is the United States Veterans Administration. HipSaver advertises its product on a national basis, including through its own Internet Web site, and it also markets its product through distributors in eight foreign countries.

Kiel is a licensed physician in Massachusetts who is board certified in internal medicine and geriatric medicine. He has done research on osteoporosis, falls, and related bone fractures; has published over 125 papers in peer-reviewed journals; and is regarded by others as an expert on hip protectors. In February, 2001, the National Institutes of Health awarded Kiel a five-year grant, in the amount of $8,424,636, to study the efficacy of hip protectors in reducing the risk of hip fractures when worn by nursing home residents. The findings of at least twelve earlier studies on the efficacy of hip protectors had produced mixed conclusions.

A clinical trial was conducted between October, 2002, and

---

[3]We acknowledge the amicus brief submitted by Massachusetts General Hospital, Brigham and Women's Hospital, McLean Hospital, Spaulding Rehabilitation Hospital, Dana-Farber Cancer Institute, Boston Medical Center, and Massachusetts Eye and Ear Infirmary.

October, 2004, and involved 1,042 residents of thirty-seven nursing homes in Massachusetts, Missouri, and Maryland. The device that was studied was a hybrid hip protector that contained a plastic sheath embedded in ethylene vinyl acetate (EVA) foam. It was not a HipSaver product. During the clinical trial, nursing home residents wore the pad on one hip, but not on the other hip, so that they could serve as their own control subjects.[4] The National Institutes of Health appointed a data and safety monitoring board (DSMB) to oversee the conduct of the trial. Approximately twenty months after its commencement, the DSMB recommended that the trial be terminated "due to lack of efficacy and the low probability of being able to demonstrate efficacy in the remaining years of the study." The researchers involved with the clinical trial then decided to submit an article to JAMA for publication.

JAMA is a highly respected, peer-reviewed, general medical journal whose key objective is to "promote the science and art of medicine and the betterment of the public health." It is the most widely circulated medical journal in the world and has been published continuously since 1883. Following submission of the article, JAMA undertook a seven-month peer review process, after which it proceeded with publication. The following statement appeared in the conclusion of the article: "In summary, this large multicenter clinical trial failed to demonstrate a protective effect of a hip protector on hip fracture incidence in nursing home residents despite high adherence, confirming the growing body of evidence that hip protectors are not effective in nursing home populations" (emphasis added). Similarly, the following statements appeared in the abstract summarizing the article: "In this clinical trial of an energy absorbing/shunting hip protector conducted in US nursing homes, we were unable to detect a protective effect on the risk of hip fracture, despite good adherence to protocol. These results add to the increasing body of evidence that hip protectors, as currently designed, are

---

[4]According to HipSaver, a "hip protector" provides padding to *both* hips, and there are no "one-sided" hip protectors on the market. For the sake of simplicity, we shall refer to the one-sided device that was studied in the clinical trial as a "hip protector," recognizing that such a device has not been designed for single hip usage.

not effective for preventing hip fracture among nursing home residents" (emphasis added).[5]

In its action against Kiel for commercial disparagement, Hip-Saver alleged that, prior to publishing the results of the clinical trial, Kiel knew or had reason to know that the product he had tested had a design that was different from and inferior to Hip-Saver's product, that persons likely to read and write about the article would be unaware of this distinction, and that these people would believe that the challenged statements, which were false, applied to all hip protectors, including those made by HipSaver. HipSaver further alleged that Kiel published the article with malice and with reckless indifference to the fact that his conduct would injure the company. HipSaver claimed that, as a direct and foreseeable consequence of the article's publication, it has suffered and will continue to suffer severe economic damages, including, but not limited to, the loss of sales and the costs of advertising to mitigate the harm caused by the challenged statements.

In her memorandum of decision and order allowing Kiel's motion for summary judgment, the judge first stated that Hip-Saver had not introduced any evidence demonstrating the falsity of the challenged statements. Proposed testimony from two expert witnesses that, in their opinions, the design of the clini-cal trial was flawed did not necessarily mean that its scientific conclusions were false. Therefore, HipSaver had failed to produce evidence to satisfy its burden of proof with regard to this es-sential element of its claim. Next, the judge pointed out that the issue whether "malice" is a required element of the tort of commercial disparagement has not been decided definitively in Massachusetts. Nonetheless, proceeding on the assumption that it is a required element, see *Dulgarian* v. *Stone*, 420 Mass. 843, 852 (1995), the judge concluded that HipSaver had not demon-strated that Kiel published the challenged statements with intentional or reckless disregard for their truth or falsity. Finally, the judge determined that, where HipSaver had failed to intro-duce evidence to support two essential elements of its claim

---

[5]We shall refer to these quoted statements from the conclusion of the article and the related abstract, which are the basis of HipSaver's claim for com-mercial disparagement, as the "challenged statements."

for commercial disparagement, the judge need not address the remaining arguments presented in Kiel's motion for summary judgment.

2. *Standard of review.* Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). See also *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass. R. Civ. P. 56 (c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Id.* See *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991) (moving party's burden "need not be met by affirmative evidence negating an essential element of the plaintiff's case, but may be satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial"). We review a decision to grant summary judgment de novo. See *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007).

3. *Discussion.* An action for commercial disparagement is similar in many respects to an action for defamation, but there are important differences. Both torts seek to impose liability on a defendant for harm sustained by a plaintiff as a result of the publication of a false statement about the plaintiff to others. See *White* v. *Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004); *Dulgarian* v. *Stone, supra.* See also Restatement (Second) of Torts § 623A comment g, at 340-341 (1977). A defamation action, which encompasses libel and slander, affords a remedy for damage to the reputation of the injured party. See *White* v. *Blue Cross & Blue Shield of Mass., Inc., supra*; *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 629-630 (2003). See also Restatement (Second) of Torts, *supra* at § 559. By comparison, an action for commercial disparagement affords a remedy for harm to the economic interests of the injured party that results in pecuniary loss.[6] See *Dulgarian* v. *Stone, supra.* See also Restatement (Second) of Torts, *supra* at § 623A comment g. A

---

[6] The line between commercial disparagement and defamation often is dif-

plaintiff asserting such a claim seeks to recover damages for false disparaging statements about the plaintiff's property, often a product or service being sold. See *U.S. Healthcare, Inc.* v. *Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir.), cert. denied, 498 U.S. 816 (1990). See also 2 R.D. Sack, Defamation § 13:1.1, at 13-3 (4th ed. 2012).

In *Dulgarian* v. *Stone*, *supra*, this court adopted the language of the Restatement (Second) of Torts, *supra* at § 623A, regarding liability for commercial disparagement: "One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to [the] interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." Thus, in order to prevail on a claim alleging commercial disparagement, a plaintiff must prove that a defendant: (1) published a false statement to a person other than the plaintiff; (2) "of and concerning" the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss.[7] See Restatement (Second) of Torts, *supra* at § 651 (setting forth plaintiff's burden of proof in action for injurious

ficult to draw. See generally 2 R.D. Sack, Defamation § 13:1.4[A], at 13-10 (4th ed. 2012). "The two causes [of action] may merge when a disparaging statement about a product reflects on the reputation of the business that made, distributed, or sold it. If, for example, a statement about the poor quality of a product implies that the seller is fraudulent, then the statement may be actionable under both theories. . . . [However, c]ourts generally are reluctant to impute a lack of integrity to a corporation merely from a criticism of its product." *Dairy Stores, Inc.* v. *Sentinel Publ. Co.*, 104 N.J. 125, 133-134 (1986). See W.L. Prosser & W.P. Keeton, Torts § 128, at 965 (5th ed. 1984) ("defamation is found only where the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetrating a fraud upon the public by selling a product which he knows to be defective").

[7]Notwithstanding many similarities between the torts of commercial disparagement and defamation, it has been recognized that "[f]rom the beginning, more stringent requirements were imposed upon the plaintiff seeking to recover for [commercial disparagement] in three important respects — falsity of the statement, fault of the defendant and proof of damage." Restatement

falsehood). See also 2 R.D. Sack, Defamation, *supra* at § 13:1. 4[A], at 13-9; W.L. Prosser & W.P. Keeton, Torts § 128, at 967-970 (5th ed. 1984). Given the scarcity of appellate decisions in this Commonwealth analyzing a cause of action for commercial disparagement, we now set forth a framework for doing so. More specifically, we consider whether Kiel demonstrated that HipSaver had no reasonable expectation of proving each essential element of this tort such that the judge properly granted his motion for summary judgment. We recognize that a failure of proof as to even one element would be sufficient to defeat a claim for commercial disparagement.

a. *Falsity of the statements.* First, HipSaver has the burden of proving that Kiel published a false statement about HipSaver to a third party. See *Dulgarian* v. *Stone, supra.* See also *Flotech, Inc.* v. *E.I. Du Pont de Nemours Co.,* 627 F. Supp. 358, 365 (D. Mass. 1985), aff'd, 814 F.2d 775 (1st Cir. 1987) (as matter of common law, plaintiff in commercial disparagement action must prove that offending statements are false). Given that the article was authored by, among others, Kiel, and appeared in the most widely circulated medical journal in the world, the focus of our inquiry is whether HipSaver has established that the challenged statements are false. See W.L. Prosser & W.P. Keeton, Torts, *supra* at § 128, at 967 ("the plaintiff must carry the burden of proving that the disparaging statement is false, and if he does not do so he has no claim"). HipSaver contends that the challenged statements are false because the design of the clinical trial was flawed.[8] We conclude that any purported design defects in the clinical trial were acknowledged by Kiel

(Second) of Torts § 623A comment g, at 341 (1977). See 2 R.D. Sack, Defamation, *supra* at § 13:1.4[A], at 13-9. For purposes of this opinion, we need not elaborate at length on these particular distinctions, other than to note that as the common law of defamation has become infused with principles of the First Amendment to the United States Constitution, these distinctions have narrowed. See Restatement (Second) of Torts, *supra.* See also *Dairy Stores, Inc.* v. *Sentinel Publ. Co., supra* at 134-135.

[8]HipSaver's contention that the design of the clinical trial was flawed was predicated on the opinions of two experts, Dr. Vivian K. Dullien, a management consultant to the health care industry and quality engineer for clinical studies, and Dr. Paul J. Lupinacci, a statistician with experience designing clinical trials. Dullien was expected to testify that the purported results of the clinical trial were invalid because of, among other things, "the flawed design; a high degree of noncompliance, with the authors failing to account for

in the article, and did not necessarily render the challenged statements false. Accordingly, HipSaver has failed to present evidence that would satisfy its burden of proof in this regard.

The genesis of the clinical trial was a recognition that nearly 340,000 hip fractures were occurring each year in the United States, with the highest incidence rates being reported in nursing home residents. In the article, Kiel pointed out that the results of past studies on the efficacy of hip protectors had been conflicting.[9] To the authors' knowledge, their clinical trial was the first study of an "energy-absorbing/shunting hip protector" to be conducted in nursing homes in the United States. With regard to the design of the clinical trial, Kiel explained its underlying rationale and stated that "[n]ursing home residents wore a hip protector on [one] hip only so that each participant served as his or her own control." After describing the study's results, Kiel commented that the authors "were unable to detect a protective effect on the risk of hip fracture, despite successful recruitment, retention, and adherence to the protocol." He acknowledged that differences between his clinical trial and previous studies "may have resulted from the type of hip protector used," and he explained several possible limitations of the clinical trial, pointing out that it was intended to be an "efficacy" study and not an "effectiveness" study, particularly given the use of a one-sided hip protector.[10] Kiel ended the JAMA article

a clear disposition of all patients enrolled; and the insufficiency of the results based upon actual compliance." In Dullien's opinion, "[t]he rate of fractures to the padded as opposed to the unpadded [hip] invalidated the study design." Lupinacci was expected to testify that Kiel improperly and erroneously "extrapolat[ed his clinical results] from the resident population under study (residents using a 1-sided hip pad) to all resident populations (residents wearing hip protectors, which are designed to pad both hips). . . . The authors could not properly generalize their findings without determining whether placing padding to a single hip would cause additional instability on an aging, posturally [un]stable population."

[9]Kiel stated that, as of the date of the JAMA article (July 25, 2007), the results of thirteen randomized controlled trials had been published. Eight of those thirteen studies, including Kiel's clinical trial, "did not demonstrate a statistically significant reduction in hip fracture incidence" due to the use of hip protectors. In contrast, Kiel continued, data from the other studies "indicated that for residents in institutional care, where hip fracture rates are high, hip protectors appeared to reduce the incidence of hip fractures."

[10]According to Kiel, "[a]n efficacy study uses all available means to test

by stating that "[w]ith the development of better pad materials and more thorough testing, future studies should examine new hip protectors using nonclustered randomized designs like [his clinical trial] to avoid many methodological biases."

HipSaver has taken issue with Kiel's statements that the results of the clinical trial "add[ed] to" or "confirm[ed]" the "growing body of evidence that hip protectors are not effective in nursing home populations." However, it does not follow from HipSaver's assertion that the design of the clinical trial was flawed that the challenged statements are false. The article plainly acknowledged possible flaws and limitations with the methodology that was used, and it suggested that further studies be conducted to evaluate the efficacy of hip protectors. Irrespective of any design flaws, the results of this particular clinical trial did not show that hip protectors reduced the occurrence of hip fractures in nursing home residents, and HipSaver has not alleged that Kiel inaccurately interpreted or reported the collected data. Given that thirteen studies had been published on the efficacy of hip protectors, more than one-half of which had demonstrated no statistically significant reduction in the number of hip fractures, the challenged statements did, in fact, "add to" or "confirm[]" a "growing body of evidence that hip protectors are not effective in nursing home populations." This is not to say that Kiel's statements are the definitive word on the subject, or that the results of his clinical trial are scientifically conclusive. Nonetheless, HipSaver has failed to present evidence that would satisfy its burden of proving that the challenged statements by Kiel are false.[11]

b. *Statements "of and concerning" the plaintiff.* Given that a cause of action for commercial disparagement typically seeks to

---

an intervention even if some of these would not be practical in the real world setting. An efficacy study sets out to determine if, under ideal conditions, success would be possible. An effectiveness study, in contrast, tests an intervention under real-world conditions to see if it is effective."

[11]Given our conclusion that HipSaver has not satisfied its burden of proving that the challenged statements are false, we need not also decide whether those statements constituted "fact," "opinion," or a combination of both. See Restatement (Second) of Torts § 623A comment e, at 340 (1977) ("The common law rule has been that the injurious statement might be one of fact or one of opinion"). In the defamation context, an expression of "pure opinion" is not actionable. *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987),

recover damages for pecuniary loss resulting from false statements about a plaintiff's property, HipSaver has the burden of proving that the challenged statements were "of and concerning" HipSaver's product. Until now, this element has arisen in the context of a defamation claim. See *Eyal* v. *Helen Broadcasting Corp.*, 411 Mass. 426, 429 (1991) (to succeed in defamation action, plaintiff must establish that alleged defamatory statement published by defendant was "of and concerning" plaintiff); *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 474 (1985); *Driscoll* v. *Trustees of Milton Academy*, 70 Mass. App. Ct. 285, 298 (2007). See also Restatement (Second) of Torts § 613 & comment d (1977). However, the similarities between the two torts suggest that this element is equally relevant and essential to an action for commercial disparagement. See, e.g., *QSP, Inc.* v. *Aetna Cas. & Sur. Co.*, 256 Conn. 343, 359-360 (2001) (treating commercial disparagement like defamation by requiring that alleged damaging statement be "of and concerning" plaintiff). As cogently articulated by the Supreme Court of California, "[t]he 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt. To allow a plaintiff who is not identified, either

cert. denied, 485 U.S. 940, and 485 U.S. 962 (1988). See *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974) ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas"). Similarly, the expression of an opinion based on disclosed, nondefamatory facts is not sufficient to establish a defamation claim. See *Howell* v. *Enterprise Publ. Co.*, 455 Mass. 641, 671 (2010); *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 262 (1993). However, "[a] statement cast in the form of an opinion may imply the existence of undisclosed defamatory facts on which the opinion purports to be based, and thus may be actionable." *King* v. *Globe Newspaper Co.*, *supra* at 713. See *Driscoll* v. *Trustees of Milton Academy*, 70 Mass. App. Ct. 285, 297 (2007). See also Restatement (Second) of Torts, *supra* at § 566. The question whether the same analysis would apply in the commercial disparagement context is left for another day. See W.L. Prosser & W.P. Keeton, Torts, *supra* at § 128, at 967 ("It is not entirely clear whether the requirement of a 'false' statement excludes liability for mere opinions that imply no misstatement of objectively verifiable fact").

expressly or by clear implication, to institute such an action poses an unjustifiable threat to society." *Blatty* v. *New York Times Co.*, 42 Cal. 3d 1033, 1044 (1986), cert. denied, 485 U.S. 934 (1988). For example, "the absence of the 'of and concerning' requirement 'could invite any number of vexatious lawsuits and seriously interfere with public discussion of issues, or groups, which are in the public eye.' " *Id.*, quoting *Michigan United Conservation Clubs* v. *CBS News*, 485 F. Supp. 893, 900 (W.D. Mich. 1980), aff'd, 665 F.2d 110 (6th Cir. 1981).

"In Massachusetts, the test whether [an alleged defamatory statement] is of and concerning the plaintiff is met by proving either (1) that the defendant intended the words to refer to the plaintiff and that they were so understood or (2) that persons could reasonably interpret the defendant's words to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood." *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 785 (1989). See *Eyal* v. *Helen Broadcasting Corp.*, *supra* at 430; *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, *supra* at 483; *Driscoll* v. *Trustees of Milton Academy*, *supra*. We have said that "if the person is not referred to by name or in such manner as to be readily identifiable from the descriptive matter in the publication, extrinsic facts must be alleged and proved showing that a third person other than the person [defamed] understood it to refer to him." *Brauer* v. *Globe Newspaper Co.*, 351 Mass. 53, 56 (1966). Further, in those circumstances where the alleged defamatory statement is directed at a group, rather than a particular person, "an individual member of the defamed class cannot recover for defamation unless 'the group or class is so small that the matter can reasonably be understood to refer to the member, or . . . the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.' " *Eyal* v. *Helen Broadcasting Corp.*, *supra* at 430 n.6, quoting Restatement (Second) of Torts, *supra* at § 564A.

Here, HipSaver was not mentioned in the JAMA article, and its product was not the one that was used in the clinical trial. At the time the article was published, the hip protector that was studied was not commercially available, unlike HipSaver's

product. The article gave a lengthy, detailed description of the device that was used in the clinical trial, which was a one-sided hybrid hip protector comprised of a hard plastic sheath embedded in EVA foam. HipSaver always has marketed its product as being made entirely of soft pen cell foam, and has distinguished its product from those containing a hard shell. Additionally, HipSaver does not make a product that is designed to cover only one hip.

To the extent that the challenged statements referred to the inefficacy of "hip protectors" in general, this reference was insufficient to give rise to a conclusion that Kiel was specifically discussing HipSaver's product. Although HipSaver has alleged that it is the second largest manufacturer of hip protectors in the United States,[12] there are at least twenty-two other companies that make similar products. HipSaver has presented no affidavits from third parties prepared to testify that they understood the article as referring to or being about HipSaver and its product. During his deposition testimony on December 2, 2010, Edward L. Goodwin, the president and chief executive officer of HipSaver, stated that it was unlikely that the hip protector described in the article could be confused with HipSaver's product. Simply put, the article cannot be understood as referring to HipSaver, either expressly or by clear implication. We conclude that HipSaver has failed to present evidence that would satisfy its burden of proving that the challenged statements were "of and concerning" HipSaver's product.

c. *Publication of the statements with knowledge of or reckless disregard for their falsity.* Next, HipSaver has the burden of proving that Kiel published the challenged statements with knowledge that they were false, or with reckless disregard for their truth or falsity. See *Dulgarian* v. *Stone*, 420 Mass. 843, 852 (1995).

This particular element of a cause of action for commercial

---

[12]During his deposition testimony on November 24, 2009, Edward L. Goodwin, the president and chief executive officer of HipSaver, stated that HipSaver's largest domestic competitor was J.T. Posey Company, which was approximately twelve times larger than HipSaver. Goodwin estimated that J.T. Posey's share of the domestic market for hip protectors was approximately fifty per cent, whereas HipSaver's share of the same market was approximately thirty-five per cent.

disparagement mirrors what has been termed "actual malice" in the defamation context. "Actual malice" is proved by showing that a defendant published a defamatory statement[13] "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 280 (1964) (*New York Times*). See *King* v. *Globe Newspaper Co.,* 400 Mass. 705, 719 (1987), cert. denied, 485 U.S. 940, and 485 U.S. 962 (1988); *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 867-868 (1975). "In the context of defamation, the term 'actual malice' does not mean the defendant's dislike of, hatred of, or ill will toward, the plaintiff." *Rotkiewicz* v. *Sadowsky,* 431 Mass. 748, 755 (2000). See *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 281 (1974) (ill will or bad motives not elements of actual malice as articulated in *New York Times, supra*). "The inquiry is a subjective one as to the defendant's attitude toward the truth or falsity of the statement rather than the defendant's attitude toward the plaintiff." *Rotkiewicz* v. *Sadowsky, supra.*

Expounding on the "reckless disregard" aspect of "actual malice," the United States Supreme Court has said that "reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant* v. *Thompson,* 390 U.S. 727, 731 (1968). See *Garrison* v. *Louisiana,* 379 U.S. 64, 74 (1964) (defining "reckless disregard" as "high degree of awareness of . . . probable falsity"). See also *Murphy* v. *Boston Herald, Inc.,* 449 Mass. 42, 48 (2007), and cases cited.

---

[13]"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ravnikar* v. *Bogojavlensky,* 438 Mass. 627, 630 (2003), quoting Restatement (Second) of Torts § 559 (1977). "The test whether a publication is defamatory is whether, in the circumstances, the writing discredits the plaintiff 'in the minds of any considerable and respectable segment in the community.' " *Draghetti* v. *Chmielewski,* 416 Mass. 808, 811 (1994), quoting *Tropeano* v. *Atlantic Monthly Co.,* 379 Mass. 745, 751 (1980).

In *Vascular Solutions, Inc.* v. *Marine Polymer Techs., Inc.*, 590 F.3d 56, 59 (1st Cir. 2009) (per curiam), the United States Court of Appeals for the First Circuit noted that "neither the Supreme Court nor this one has decided whether the First Amendment [to the United States Constitution] requires in product disparagement actions the actual malice standard of *New York Times Co.* v. *Sullivan*, [376 U.S. 254, 279-280 (1964)]." The court pointed out that "[w]hether Massachusetts courts might independently read such a requirement into its common law cause of action is also unclear." *Id.* In *Dulgarian* v. *Stone*, *supra*, this court, although not using the term "actual malice," adopted the language of the Restatement (Second) of Torts, *supra* at § 623A, imposing liability for commercial disparagement where a defendant, inter alia, "knows that the statement is false or acts in reckless disregard of its truth or falsity." *Id.* This is the applicable standard in a commercial disparagement case, mirroring the "actual malice" standard that has been employed in defamation cases. We see no need formally to adopt the term "actual malice" in this context because the standard as articulated by the Restatement (Second) of Torts, *supra*, is clear and precise as to what a plaintiff must prove in order to satisfy this element of a commercial disparagement claim.[14]

---

[14]In the defamation context, a plaintiff who is shown to be a public official or public figure must prove "actual malice" in order to recover for defamation. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280 (1964). See also *Murphy* v. *Boston Herald, Inc.*, 449 Mass. 42, 48 (2007); *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 867 (1975); Restatement (Second) of Torts, *supra* at § 580A. By contrast, a plaintiff who is deemed to be a private figure may recover for defamation by proving the negligent publication of a defamatory falsehood. See *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). See also *Jones* v. *Taibbi*, 400 Mass. 786, 797-799 (1987); *Reilly* v. *Associated Press*, 59 Mass. App. Ct. 764, 769 n.3 (2003); Restatement (Second) of Torts, *supra* at § 580B. In *Flotech, Inc.* v. *E.I. Du Pont de Nemours Co.*, 627 F. Supp. 358, 365 (D. Mass. 1985), aff'd, 814 F.2d 775 (1st Cir. 1987), the court stated that the elements of the First Amendment's "public figure" doctrine (that is to say, proof of "actual malice") were equally applicable to a commercial disparagement action. See *First Act Inc.* v. *Brook Mays Music Co.*, 429 F. Supp. 2d 429, 432-433 (D. Mass. 2006).

Here, the motion judge determined that HipSaver was a limited public figure for purposes of this case because it had directly injected itself into the debate over the efficacy of hip protectors by advertising its product and sponsoring its own research. See *Bowman* v. *Heller*, 420 Mass. 517, 522, cert. denied, 516 U.S. 1032 (1995) (whether plaintiff is public figure is question of

The focus of HipSaver's argument is not that Kiel knew that the challenged statements were false, in the sense that he fabricated the data. Rather, the thrust of HipSaver's argument is that because Kiel purportedly ignored or concealed evidence suggesting that the design of the clinical trial was flawed, he therefore published the challenged statements with reckless disregard for their truth or falsity.[15] We disagree.

At the outset, it is important to recognize the scientific oversight that was an integral part of the clinical trial and the subsequent JAMA article. The National Institutes of Health appointed a DSMB to review and secure its members' agreement on the design of the study, to approve the protocol for the clinical trial and the consent forms for participants, and to oversee the conduct of the trial. Four institutional review boards (three at clinical centers and one at a data coordinating center) also assessed the trial protocol and the consent forms to ensure that they satisfied guidelines established by the United States Department of Health and Human Services. As acknowledged in the article, twenty months after the commencement of the clinical trial, the DSMB recommended that it be terminated "due to lack of efficacy and the low probability of being able to demonstrate efficacy in the remaining years of the study." The researchers involved with the trial then decided to submit an article for publication in JAMA, at which point the article underwent a seven-month peer review process. Where appropriate, the authors made changes to their draft of the article in response to the reviewers' comments and suggestions. Once this process had been completed, JAMA proceeded with publication.

---

law). See also *Gertz* v. *Robert Welch, Inc.*, *supra* at 345 (describing three classes of public figures); *Bruno & Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 588 (1st Cir. 1980). Because HipSaver has not challenged this determination, we take it as conclusive. More broadly, in light of our adoption of the language of the Restatement (Second) of Torts, *supra* at § 623A, a plaintiff in a commercial disparagement action must show that a defendant "knows that the statement is false or acts in reckless disregard of its truth or falsity," irrespective of whether the plaintiff is a public or private figure. *Id.*

[15]More specifically, HipSaver has alleged, among other things, that Kiel ignored or failed to disclose information suggesting that the use of a one-sided hip protector in the clinical trial may have caused participants to fall more frequently on the side with the padded hip, that such an outcome raised ethical concerns, and that this perceived design flaw skewed the results of the clinical trial on which the challenged statements were based.

As recognized by Kiel, and acknowledged by HipSaver, prior to this clinical trial, at least twelve studies had been published on hip protectors, and the results of those studies had varied, "some finding hip protectors useful and some finding they were not useful." Given these conflicting results, Kiel decided to approach his study of hip protectors from a different perspective, designing a clinical trial to address perceived deficiencies and biases in earlier studies. It is generally understood that scientific research is not characterized by perfect theories, flawless studies, and desired results. Rather, the hallmarks of scientific research are continuous inquiry, testing, debate, disagreement, and revision. See generally *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (scientific conclusions "subject to perpetual revision"); *Underwager* v. *Salter*, 22 F.3d 730, 736 (7th Cir.), cert. denied, 513 U.S. 943 (1994) ("More papers, more discussion, better data, and more satisfactory models — not larger awards of damages — mark the path toward superior understanding of the world around us"); *Freyd* v. *Whitfield*, 972 F. Supp. 940, 945 (D. Md. 1997) ("A rule requiring scientists and authors to guarantee the 'truth' of their hypotheses would inevitably lead to self-censorship and would stifle the very debate that leads to scientific knowledge").

The challenged statements in the article reflected Kiel's interpretation of the accurately reported data of this particular clinical trial, as it was designed and conducted, including any perceived or actual flaws. That concerns may have been raised about the chosen design does not mean that Kiel entertained serious doubts about the truth of the challenged statements as they were a reflection of the achieved results. Kiel candidly discussed the underlying flaws in and limitations of the clinical trial when he included the following statements, among others, in the article: "[T]he pad we chose, while believed to be the best available at the time of the study based on biomechanical testing, may not have been good enough to prevent hip fractures. . . . Our study design, while overcoming potential biases . . . does not completely generalize to the clinical setting where 2-sided hip protectors are used. Even adherence data for [one]-sided hip protector use may not be generalizable to the setting of [two]-sided hip protector use. . . . [W]e cannot

exclude the possibility that having only [one] hip protected could have modified the propensity to fall to the protected side either because of the mechanical positioning of the pad or because of sensory cues from the pad that altered gait." We conclude that HipSaver has not presented evidence that would satisfy its burden of proving that Kiel entertained serious doubts about the truth of the challenged statements such that he must be deemed to have published those statements with reckless disregard for their truth or falsity.[16]

d. *Intent or likelihood that publication will result in pecuniary harm.* As to the next essential element of a cause of action for commercial disparagement, we have said that "[o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if . . . he intends for publication of the statement to result in harm to [the] interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so . . . ." *Dulgarian* v. *Stone*, 420 Mass. 843, 852 (1995), quoting Restatement (Second) of Torts § 623A. See 3 D.B. Dobbs, P.T. Hayden, & E.M. Bublick, The Law of Torts § 658, at 622 (2d ed. 2011). The Restatement (Second) of Torts, *supra* at § 623A comment b, at 336, explains that "[t]he publisher . . . should as a reasonable man recognize the likelihood that some third person will act in reliance upon his statement, or that it will

---

[16]We comment briefly on two other arguments presented by HipSaver. First, HipSaver has asserted that because Kiel failed to disclose in the research grant application his financial ties to pharmaceutical companies that manufacture drugs to promote bone density, which purportedly gave rise to a conflict of interest, he must have published the challenged statements with reckless disregard for their truth or falsity. However, HipSaver has not presented any evidence either to show that bone density drugs compete with hip protectors in the marketplace, or to prove that Kiel's research on such drugs biased or otherwise impacted his ability to conduct a clinical trial on hip protectors. Moreover, the clinical trial was not a study on the efficacy of hip protectors as compared to the efficacy of bone density drugs in reducing the incidences of hip fractures in nursing home residents.

Second, HipSaver has asserted that when Kiel responded to an electronic mail message from Goodwin on April 20, 2003, and accused Goodwin of being a "scam artist," it highlighted Kiel's readiness to make statements without any factual foundation. Although this intemperate personal comment may have reflected Kiel's dislike for Goodwin, it was not evidence of Kiel's attitude toward the truth or falsity of the challenged statements.

otherwise cause harm to the pecuniary interests of the other because of the reliance."

HipSaver contends that Kiel recognized, or should have recognized, that publication of the article was likely to result in pecuniary harm to HipSaver.[17] It points to two instances when Kiel purportedly revealed his understanding of the article's potential negative consequences for manufacturers of hip protectors, including HipSaver. First, the name of the particular device that was used in the clinical trial, a FallGard hip protector manufactured by Dr. Stanley L. Weiner, was removed from the article prior to its publication in July, 2007. On September 7, 2005, Wiener had sent an electronic mail message (e-mail) to Kiel in which he said that including the name of his product in the article "might lead us to be involved in costly litigation and loss of market share." Second, on April 20, 2003, Goodwin sent an e-mail to Kiel in which he said, "From what I am hearing about Fall Guard in the nursing homes . . . your study will be just another nail in the coffin of the hip protector product category." In response, Kiel sent an e-mail to Goodwin in which he stated, "FallGard is superior to your untested product. You are the biggest scam artist. The nail will not be in any coffin but your own." In HipSaver's view, these communications showed that Kiel recognized and understood that publication of the article likely would cause manufacturers of hip protectors, including HipSaver, pecuniary harm — third parties would rely on the information that was set forth in the article and, as a consequence, decide not to purchase hip protectors. We agree and conclude that, based on the import of these communications, HipSaver had a reasonable expectation of proving this essential element of its claim for commercial disparagement.

e. *Special damages.* Finally, we turn to the last essential element of a cause of action for commercial disparagement. Hip-Saver has the burden of proving that it sustained "special damages" in the form of pecuniary loss as a result of the publication of the challenged statements.

Until now, this court has not had the opportunity to consider

---

[17]Kiel has not addressed this element of a commercial disparagement claim.

the "special damages" element of a claim for commercial disparagement. See *Vascular Solutions, Inc.* v. *Marine Polymer Techs., Inc.*, 590 F.3d 56, 62 (1st Cir. 2009) (pointing out that Massachusetts jurisprudence has not analyzed proof of special damages in commercial disparagement cases, but has followed Restatement with regard to other aspects of tort). It is generally acknowledged that special damages are an essential part of a cause of action for commercial disparagement, see W.L. Prosser & W.P. Keeton, Torts § 128, at 970-971 (5th ed. 1984), and "must always be proved" by the plaintiff. Restatement (Second) of Torts, *supra* at § 623A comment g, at 341. See *Sharratt* v. *Housing Innovations, Inc.*, 365 Mass. 141, 148 (1974) (recovery in action alleging intentional falsehood pertaining to professional services is for "specific, actual and proven harm done to the plaintiff's economic interests"); *Dooling* v. *Budget Publ. Co.*, 144 Mass. 258, 259 (1887) ("Words relating merely to the quality of articles made, produced, furnished, or sold by a person, though false and malicious, are not actionable without special damage"); *Swan* v. *Tappan*, 5 Cush. 104, 109 (1849). See also Restatement (Second) of Torts, *supra* at § 651(1)(h) & comment b, at 372-373 (burden of proof on plaintiff to show pecuniary loss resulting from publication). A plaintiff's recovery is limited to the "pecuniary loss that results directly and immediately from the effect of the conduct of third persons" acting in response to the alleged disparagement, and "the expense of measures reasonably necessary to counteract the publication." *Id.* at § 633(1)(a), (b).

Typically, to establish special damages in a commercial disparagement action, a plaintiff must show, where feasible, a specific loss of sales to identifiable customers. See *id.* at § 633(2)(a) & comment c, at 355 ("pecuniary loss may be established by . . . proof of the conduct of specific persons . . . . The most usual manner in which a third person's reliance upon disparaging matter causes pecuniary loss is by preventing a sale to a particular purchaser"); W.L. Prosser & W.P. Keeton, Torts, *supra* at § 128, at 972 (plaintiff ordinarily "must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived"); 2 R.D. Sack, Defamation § 13:1.4[F], at

13-20 to 13-23 (4th ed. 2012). See also *Amerinet, Inc.* v. *Xerox Corp.*, 972 F.2d 1483, 1503 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993) (plaintiff's business disparagement claims do not survive summary judgment on special damages issue where "[t]he record contains no evidence of specific lost sales or of losses directly attributable to particular false statements by [the defendant]"); *Fashion Boutique of Short Hills, Inc.* v. *Fendi USA, Inc.*, 75 F. Supp. 2d 235, 239-241 (S.D.N.Y. 1999), aff'd, 314 F.3d 48 (2d Cir. 2002) (rejecting claim for commercial disparagement where plaintiff did not identify specific lost customers when possible to do so).[18] The Restatement (Second) of Torts, *supra* at § 633 comment g, at 356, explains that "[w]hen the loss of a specific sale is relied on to establish pecuniary loss, it must be proved that the publication was a substantial factor influencing the specific, identified purchaser in his decision not to buy." The plaintiff's burden of proving specific lost sales "ensures that the actual pecuniary harm the tort is designed to remedy did, in fact, occur." *Vascular Solutions, Inc.* v. *Marine Polymer Techs., Inc.*, *supra* at 65 (Lipez, J., concurring in part and dissenting in part).

An exception to the requirement of specific lost sales has been recognized in circumstances where a false statement has been "widely disseminated," and it would be impossible to identify particular customers who chose not to purchase a plaintiff's goods or services. See Restatement (Second) of Torts,

_____

[18]We are aware that a more "modern view" has been recognized in some jurisdictions. This view permits a plaintiff, who can show neither a loss of specific sales nor a widespread dissemination of a false disparaging statement, to prove special damages by showing that he has suffered a general decline in business or lost growth opportunity, also described as the loss of a present or prospective advantage. See *Advanced Training Sys., Inc.* v. *Caswell Equip. Co.*, 352 N.W.2d 1, 7-8 (Minn. 1984); *Patel* v. *Soriano*, 369 N.J. Super. 192, 248 (App. Div. 2004). See also *Porous Media Corp.* v. *Pall Corp.*, 110 F.3d 1329, 1339 (8th Cir. 1997). Such a plaintiff must eliminate other possible explanations for the decline, leaving only the defendant's statements to third parties as the reason for the loss. See *Advanced Training Sys., Inc.* v. *Caswell Equip. Co.*, *supra*. See also *Amerinet, Inc.* v. *Xerox Corp.*, 972 F.2d 1483, 1503-1504 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993); *Patel* v. *Soriano*, *supra* at 249. This approach has not been espoused in the Restatement (Second) of Torts, *supra* at § 633. In the circumstances of this case, where HipSaver has not satisfied other essential elements of its cause of action for commercial disparagement, we leave for another day the issue whether this method for determining special damages should be added to our jurisprudence.

*supra* at § 633(2)(b) ("pecuniary loss may be established by . . . proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify"). A plaintiff's burden of proof with regard to widely disseminated commercial disparagement may be satisfied "by circumstantial evidence showing that the loss [of the market] has in fact occurred, and eliminating other causes." *Id.* at § 633 comment h, at 357.

As explained in the Restatement (Second) of Torts, *supra*, "[w]idely disseminated [commercial disparagement] may . . . cause serious and genuine pecuniary loss by affecting the conduct of a number of persons whom the plaintiff is unable to identify and so depriving him of a market that he would otherwise have found. When this can be shown with reasonable certainty, the rule requiring the identification of specific purchasers is relaxed and recovery is permitted for the loss of the market." See *Rite Aid Corp.* v. *Lake Shore Investors*, 298 Md. 611, 625-626 (1984) ("Pecuniary loss may be established by proof of the conduct of specific persons, or proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify"). See also *Fashion Boutique of Short Hills, Inc.* v. *Fendi USA, Inc.*, *supra* at 240-241 (where alleged disparaging statements made to nine identifiable customers, no evidence of widespread dissemination necessary to satisfy narrow exception to law of special damages); *Charles Atlas, Ltd.* v. *Time-Life Books, Inc.*, 570 F. Supp. 150, 155-156 (S.D.N.Y. 1983) (plaintiff need not identify specific lost customers where plaintiff sells product only through mail orders, rendering it virtually impossible to identify those who did not order product because of disparaging article). This exception "is most plainly applicable when disparaging remarks appear in a publication that is distributed to a general audience, leaving the plaintiff unable to identify specific customers who were lost or specific individuals who might have become customers, but did not, because of the negative information communicated by the defendant." *Vascular Solutions, Inc.* v. *Marine Polymer Techs., Inc.*, *supra* at 66 (Lipez, J., concurring in part and dissenting in part). See *Charles Atlas, Ltd.* v. *Time-Life Books, Inc.*, *supra*.

"The widespread dissemination exception is rooted in

principles of fairness, meant to accommodate plaintiffs who lack one-to-one contact with their own customers and are therefore unable to identify individual recipients of the defendant's message." *Vascular Solutions, Inc.* v. *Marine Polymer Techs., Inc., supra* at 68 (Lipez, J., concurring in part and dissenting in part). We now recognize the "widespread dissemination" exception to the general rule that a plaintiff in a commercial disparagement action must prove a specific loss of sales to identifiable customers before the plaintiff can recover for pecuniary loss. Our recognition of this exception does not alter or eliminate the plaintiff's burden of establishing that the disparaging publication was the direct and immediate cause of the pecuniary loss. See Restatement (Second) of Torts, *supra* at §§ 633(1)(a), 651(1)(h).

HipSaver contends that, as the second largest manufacturer of hip protectors in the United States, it felt the full brunt of the words in the challenged statements that hip protectors "are not effective." As a consequence, HipSaver suffered special damages because it lost sales and its annual revenues decreased as a result of the article's widespread dissemination, over the Internet and in print, to a large number of individuals who are impossible to identify. Further, HipSaver asserts that it incurred the expense of implementing measures that were reasonably necessary to counteract publication of the article, such as commencing this litigation and paying for advertising to mitigate the perceived harm.

We begin by pointing out that HipSaver has not elicited any information from its customers to determine whether their purchasing decisions were influenced by the article, and Goodwin has been unable to identify any existing or potential customers of HipSaver who decided not to do business with the company as a result of the article's publication. Therefore, because HipSaver has not shown a specific loss of sales to identifiable customers, we focus on the "widespread dissemination" exception to this requirement.

In light of the fact that the article appeared in the most widely circulated medical journal in the world, both in print and on the Internet, it cannot be disputed that there was widespread dissemination of the challenged statements. HipSaver claims that it

has lost sales of over four million dollars since the publication of the article. This contention is predicated on the opinions of two experts, Dr. Robert A. Rosenthal, an economics professor, and Deborah M. Salvucci, a certified public accountant. In his answers to Kiel's interrogatories, Goodwin, on behalf of Hip-Saver, described the expected testimony from these experts. Based on their analyses of facts appearing in Federal income tax returns and sales-related data from records maintained by HipSaver, the experts were expected to testify that, due to a decline in sales revenues, HipSaver lost profits of $578,830 for the period from 2007 to 2009, and would lose profits of $3,716,625 for the period from 2010 to 2014. According to Goodwin, "[t]o determine lost net profits, [the] experts calculated lost revenues by employing the 'before and after' method, which invokes a comparison of HipSaver['s] performance" before and after publication of the article. Further, the experts identified five per cent and ten per cent as "reasonable estimates of projected rates of growth of revenues in the years succeeding 2006." What is significant is that there is no opinion from these experts that such alleged lost profits are a direct and immediate result of the publication of the article, rather than any number of other factors that could have negatively affected the sales of HipSaver's product. In fact, Goodwin testified that no expert ever advised HipSaver that, in the expert's opinion, the publication of the article caused an adverse impact on HipSaver's sales.

Goodwin acknowledged that HipSaver had not examined whether there was any material change in the size of its customer base from before the publication of the article until after its publication. Nonetheless, Goodwin performed his own analysis of monthly sales from 2003 until approximately July of 2009, and he observed a decline in company sales beginning sometime in 2007. In Goodwin's view, it was "obvious" that this decline was attributable to the article because "[i]t's a well-known fact that clinical studies are a major asset to the value and sales of a company and if it's a negative clinical study that's published then it impacts negatively on the company as well." However, Goodwin presented no evidence to substantiate this "well-known fact." Prior to the publication of the article, at least twelve other

studies had been published on the efficacy of hip protectors, some of which had been positive and others of which had been negative, but Goodwin did not analyze their particular impact on HipSaver's sales. Moreover, Goodwin did not know whether any of HipSaver's competitors had experienced a material change in the size of its customer base as a consequence of the publication of the article, thereby suggesting a causal relationship between the publication of the article and the over-all sales of hip protectors. Goodwin was not aware of any studies on the impact of the article on HipSaver's competitors.

Even assuming that Goodwin's "well-known fact" is true, he has not eliminated other causes for HipSaver's pecuniary loss. Several years prior to the publication of the article, in 2004 and 2005, HipSaver had sued its largest competitor, J.T. Posey Company (Posey), for false advertising in which Posey essentially had asserted that "HipSaver was no good and Posey was great." Goodwin testified that although HipSaver lost customers as a result of Posey's false advertising, the negative impact on its sales had ended by September, 2005, long before the publication of the article in July, 2007. At the same time, Goodwin acknowledged that, by the end of 2005, HipSaver had been "completely frozen out of every private sector nursing home and health care facility chain and every private distribution chain." Further, by January of 2007, HipSaver had been "frozen out of all the major catalog distributors and resellers of hip protectors," and still had "no ability to access the private health care distribution and facility chains." Based on this evidence, HipSaver has not eliminated the impact of the false advertising by Posey as a cause of its lost sales after publication of the article.[19]

In sum, HipSaver had the burden of proving that, as a direct

---

[19]Goodwin also pointed to a change in Medicare's reimbursement policies to substantiate HipSaver's claim that its loss of sales was attributed to the publication of the article. Beginning around October, 2008, the Medicare program stopped reimbursing acute care hospitals for medical care associated with hip fractures sustained by their patients. HipSaver expected that these hospitals would purchase its hip protectors as a means of preventing hip fractures among their patients and avoiding substantial medical costs that no longer would be reimbursed. Whether the change in Medicare's reimbursement policies would have led to a growth in sales for HipSaver's product is wholly speculative.

and immediate consequence of the widespread dissemination of the challenged statements, it suffered pecuniary loss that was not attributable to other causes. We conclude that HipSaver has not presented evidence to demonstrate that it had a reasonable expectation of satisfying this burden of proof. It has not established that its purported pecuniary loss necessarily resulted from the publication of the article.[20]

4. *Conclusion.* HipSaver has failed to demonstrate that it had a reasonable expectation of proving all the essential elements of a cause of action for commercial disparagement. Accordingly, the decision and order of the Superior Court judge granting summary judgment to Kiel is affirmed.

*So ordered.*

---

[20]Although a plaintiff in a commercial disparagement action may recover "the expense of measures reasonably necessary to counteract the publication," Restatement (Second) of Torts § 633(1)(b) (1977), the plaintiff first must prove all the essential elements of the tort. See *Advanced Training Sys., Inc.* v. *Caswell Equip. Co.*, 352 N.W.2d 1, 8 (Minn. 1984) ("Efforts to mitigate damages in tort are not compensable unless plaintiff proves a tort, and where special damages are an essential element of plaintiff's action, they must be proved before mitigation expenses may be considered"). Because HipSaver has not done that here, it is not entitled to recover mitigation expenses.