Kaplan, Mitchell H., J.
This case arises out of a dispute concerning the number of shares defendant/plaintiff-in-counterclaim Allen Sneider (Sneider) holds in plaintiff/defendant-in-counterclaim Karmaloop, Inc., the successor entity to Karmaloop, LLC. (The plaintiff will be referred to as Karmaloop or the company and distinctions between the corporation and the LLC will be identified only when necessary.) Now before the court are defendant-in-counterclaim Christopher Mastrangelo’s (Mastrangelo) motion for summary judgment dismissing Counts V, VI and VII, of the Amended Verified Counterclaims (the counterclaim), and defendants-in-counterclaim Karmaloop’s and Greg Selkoe’s motion for summary judgment dismissing all counts of Sneider’s counterclaim, except for Count IX which seeks a declaration that Sneider owns 871,109 shares of Karmaloop. For the following reasons, Mastrangelo’s motion. is ALLOWED and Karmaloop’s and Selkoe’s motion is ALLOWED, in part, and DENIED, in part.
BACKGROUND
The following facts are taken from the voluminous summary judgment record, made more difficult to follow by the parties’ decision not to file a joint appendix. While in ruling on the instant motions all inferences with respect to disputed facts must be drawn in favor of Sneider, in this case the court has found it useful, in many instances, to indicate the parties’ opposing contentions with respect to disputed issues of fact. Where there is record evidence supporting Sneider’s position and the disputed issue is material, such a dispute, of course, precludes the entry of summary judgment.
Karmaloop, LLC was a Massachusetts limited liability company; it was co-founded by Selkoe and Alex Mendoza in 1999. In 2001, Selkoe’s father, Dennis *457 Selkoe, purchased Mendoza’s equity interest. While there is some dispute concerning whether the Selkoes owned all of the units in Karmaloop by the beginning of 2002, they at least owned nearly all of them. Greg Selkoe was Karmaloop, LLC’s chief executive officer. Karmaloop, Inc. is a Delaware corporation organized on July 9, 2008. On July 14, 2008, it became the successor by merger of Karmaloop, LLC, at which time the unit owners of Karmaloop, LLC became shareholders of the successor corporation, Karmaloop, Inc. The reorganization of Karmaloop as a Delaware corporation occurred in connection with a $30 million equity investment in the enterprise by a venture capital firm, Insight Venture Partners (Insight). Selkoe has been Karmaloop’s president and chief executive officer since the merger. Prior to 2005, Mastrangelo was Karmaloop’s outside counsel; in 2005 he became a full-time employee in addition to legal counsel. Since 2008, Mastrangelo has been Karmaloop’s general counsel and a member of its management team.
In 2002, Sneider was introduced to Selkoe. Sneider was a certified public accountant and had been a partner at the accounting firm, Laventhol and Horwath. Sneider told Selkoe that he could provide business advice to him and assist in raising capital for Karmaloop. Selkoe asked Sneider to work with Karmaloop and Sneider began work for the company as an independent financial and business consultant. Initially, Karmaloop did not pay Sneider cash for his services. In October 2002, Selkoe and Sneider orally agreed that Sneider would receive units and warrants in Karmaloop as consideration for his services (the compensation agreement).[1] Pursuant to this agreement, Selkoe caused 7% of Karmaloop’s outstanding units to be issued to Sneider, as of October 1, 2002— 159,891 units. A document drafted by Sneider and signed by Selkoe reflected this grant of units.
According to the defendants[2] in 2003, Sneider asked for additional equity in Karmaloop. After consultation with his father, Selkoe, by emails dated June 19, 2003 and June 25, 2003, offered Sneider additional equity equal to 1% of the outstanding units, plus warrants to buy an additional 1% of the then outstanding units.[3] Sneider declined the offer. Instead, according to Sneider, on September 16, 2003, he and Selkoe orally agreed that Karmaloop would issue him 117,310 units to protect his percentage ownership interest in Karmaloop from dilution so that he would continue to own seven percent of Karmaloop and, going forward, Karmaloop would continue to issue additional units to him to protect his equity from dilution (the first dilution protection agreement; discussed a greater length, infra). Pursuant to that agreement, according to Sneider, he was issued a total of 158,382 units. In addition, Sneider asserts that, following conversations with Selkoe and with Selkoe’s approval, Karmaloop issued to Sneider an additional 62,057 units on January 2, 2004; 97,670 units on October 1, 2004; and 64,900 units on June 1, 2005. Sneider also alleges that Karmaloop issued to him 181,303 warrants on December 31, 2003, of which 90,753 were to be protected from dilution, and an additional 109,052 warrants in 2004 and 2005. Snei-der maintains that the units and warrants issued him were recorded on spreadsheets that he maintained with Selkoe’s approval. The defendants assert that there are no Karmaloop records reflecting grants of units or warrants to Sneider after October 2002.
In late 2005, the relationship between Sneider and Selkoe began to deteriorate. According to the defendants, at Selkoe’s direction, Mastrangelo undertook an investigation that disclosed, among other things, that Sneider was claiming ownership of the units and warrants referred to in the preceding paragraph and that Sneider had been causing Karmaloop to pay him for professional services and reimburse him for personal expenses in amounts that Selkoe had not approved. Sneider maintains that Mastrangelo’s investigation did not reveal any material information that Selkoe did not already know. Following a November 2005 meeting attended by Selkoe, his wife Dina Selkoe, who was then working at Karmaloop, Dennis Selkoe and Mastrangelo, Selkoe attempted to negotiate a resolution of Sneider’s disputed rights to these units and warrants pursuant to which Sneider would transfer some of the units and warrants as to which he claimed ownership to Selkoe, but Sneider rejected the proposal.
The parties agree that, beginning in early 2006, Sneider ceased to provide services to Karmaloop on a full-time basis. Sneider maintains that he continued to consult for Karmaloop through April 2007; the defendants assert that he ceased to provide any services after January 2006.
On June 26, 2006, Sneider requested and was permitted to exercise warrants for 328,209 units at a price of $0.01 per unit. He paid the exercise price with a check, cashed by Karmaloop. After the exercise, Sneider claimed that he owned 871,109 units. On more than one occasion over the next two years, Karmaloop confirmed to Sneider his ownership of these units. The defendants contend that they did not confront Sneider regarding his ownership of these disputed units because of his threats to sue Karmaloop, if they did, and the distressed financial position of Karmaloop at that time that made the defendants waxy of litigation with Sneider.
Meanwhile, according to Sneider, between 2006 and 2008, Selkoe, Dennis Selkoe and Mastrangelo used various improper means[4] to cause Karmaloop to issue to them and Dina Seiko additional units and warrants. This significantly diluted Sneider’s equity interest in Karmaloop (along with the many other Karmaloop investors) and deprived him of the compensation agreed upon in the compensation agreement, i.e., continuous ownership of 7% of Karmaloop, in *458 perpetuity. By June 2008, Sneider asserts, the number of fully diluted outstanding Karmaloop units was 11,000,000, as compared to 6,000,000 in December 2005. At a Januaiy 2008 shareholders meeting, outside shareholders, who were not involved in the day-to-day management of Karmaloop, first learned that the number of fully diluted units issued had increased dramatically. Sneider contends that the defendants tried to keep the shareholders “in the dark” by denying them access to financial records and information, and by “scapegoating” Sneider. Concerned that the defendants were attempting to deny him his equity rights in Karmaloop, Sneider requested that the company provide him with its books and records pursuant to G.L.c. 156C, §§9-10. Karmaloop refused.
In July 2008, Insight made a $30 million equity investment in Karmaloop. Of that amount, $5 million was to be used for working capital, and up to $25 million was available to fund a repurchase of Karmaloop shares (following the reorganization of Karmaloop as a Delaware corporation) from existing shareholders (the repurchase offer). Under the repurchase offer, shareholders were offered the right to sell up to 40% of their shares back to Karmaloop at a price of $5.52 per share.
Sneider asserts that no one at Karmaloop informed him of Insight’s investment or that Karmaloop would be converting to a Delaware corporation; nor did the defendants include him in an August 6, 2008, notification to all shareholders of the repurchase offer. Sneider notified Karmaloop that he, nonetheless, intended to participate in the repurchase offer. The defendants assert that, because they were suspicious of Sneider’s claim of equity ownership, they refused to allow him to participate in the repurchase at all. As a result of the repurchase offer, according to Sneider, the Selkoes and Mastrangelo realized more than $13 million.
Karmaloop filed this action on August 12, 2008, seeking, among other things, a declaratory judgment as to the amount of Sneider’s equity interest in the company.[5] Sneider counterclaimed; his Amended Verified Counterclaims was filed on Januaiy 20, 2010.[6] He asserts claims for slander of title against Karmaloop, Selkoe and Mastrangelo (Count I); breach of contract against Karmaloop (Count II); breach of duty of good faith and fair dealing against Karmaloop (Count III); tortious interference with contract against Selkoe and Mastrangelo (Count IV); tortious interference with advantageous business relationship against Selkoe and Mastrangelo (CountV); breach of fiduciary duty against Seiko and Mastrangelo (Count VI); conversion apparently against all defendants (Count VII); abuse of process (Count VIII); and declaratory judgment (Count IX).
By orders dated February 1, 2011, the Court (Budd, J.) dismissed Counts I, IV, and VII of the counterclaims to the extent that they pled claims against Mastrangelo and denied Karmaloop’s and Selkoe’s motion to dismiss Counts I-IV and VII. The defendants now move for summary judgment on the remaining claims, except to the extent of Sneider’s claim of ownership of 871,109 Karmaloop shares, which defendants continue to dispute, but as to which they acknowledge disputed issues of material fact that must be resolved at trial.
The standards to be applied in considering motions for summary judgment are well known to the parties and need not be recited.
DISCUSSION
Count I: Slander of Title
In Count I, Sneider asserts a claim for slander of title against Karmaloop and Selkoe. Slander of title is defined as a “a false or malicious statement, oral or written, made in disparagement of a person’s title to real or personal property, causing him injury.” Powell v. Stevens, Civil Action No. 00-0089, 2004 WL 1047451 at *2 (Suffolk Super.Ct. May 3, 2004) [17 Mass. L. Rptr. 592], quoting 50 Am.Jur.2d Libel & Slander, §548 (1995), affirmed, 69 Mass.App.Ct. 87 (2007). To succeed on a slander of title claim, a plaintiff must plead and prove special damages. Powell, 2004 WL 1047451 at *3, quoting Restatement (Second) of Torts §624; Gott v. Pulstfer, 122 Mass. 235, 237-38 (1876). The special damages rule requires that the plaintiff establish pecuniary loss that resulted “directly and immediately from the effect of the conduct on third persons, including impairment of vendibility or value caused by disparagement.” Restatement (Second) ofTorts §633(l)(a); see HipSaver, Inc., v. Kiel, 464 Mass. 517, 535 (2013).
Sneider’s claim of slander of title fails because the summary judgment record makes clear that he did not sustain special damages as a result of the defendants’ statements. See HipSaver, Inc., 464 Mass, at 535; Gott, 122 Mass, at 237-38. Sneider alleges that the defendants made false statements to other shareholders regarding Sneider’s title to his units (and later shares) in Karmaloop. Further, he argues that he suffered special damages when he was deprived of the $2 million that he would have received, if he had not been excluded from the repurchase offer. But to establish a slander of title claim in this context, Sneider must prove that the false statements made by the defendants caused a third party to decline to purchase Sneider’s ownership interest in Karmaloop. See HipS-aver, Inc., 464 Mass. at 535; Gott, 122 Mass. at 237-38. Sneider, however, never sought to sell his units in Karmaloop to a third party, and he did not suffer a pecuniary loss as a result of a third party’s reliance on the purportedly defamatory statements. See HipSaver, Inc., 464 Mass. at 535; Gott, 122 Mass, at 237-38. Rather, Sneider’s alleged harm is solely a result of defendant Karmaloop’s decision not to allow Sneider to participate in its own repurchase offer and to file this action asking the court to declare the extent, if *459 any, of Sneider’s ownership of Karmaloop shares. See HipSaver, Inc., 464 Mass, at 535.
Count II: Breach of Contract
Sneider asserts that between June 2005, and December 2008, Karmaloop issued about 11,000,000 new units, shares, and options, mostly to the Selkoes and Mastrangelo (see n.4, supra), thereby materially diluting his equity interest in the company. Ex. 13, Int. 8. He claims that Karmaloop breached the September 16, 2003, oral agreement reached with Selkoe that Karmaloop would provide ongoing dilution protection for his seven percent interest in the company for as long as it was in existence, and a January 1, 2003 oral agreement to protect two percent of his warrants from dilution. As a result, he contends that he is owed 842,889 additional units that would bring his equity interest up to the guaranteed seven percent, and 16,962 additional warrants necessary to protect his warrants from dilution.
Karmaloop advances several arguments in support of its motion for summary judgment. It first cites Jeffreys v. City of New York, 426 F.3d 549, 554 (2nd Cir. 2005), and J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1257 (1st Cir. 2005), for the proposition that where the facts asserted are so contradictory that their plausibility is doubtful, a court may dismiss the complaint. Stated differently, the defendants argue that, under these circumstances, there must be some evidence, beyond the plaintiffs deposition testimony, from which a reasonable jury could find for the plaintiff. Jeffreys, 426 F.3d at 554. Karmaloop points specifically to Sneider’s Verified Counterclaim, in which he does not allege that any units awarded him were for the purpose of dilution protection. In contrast, during deposition, Sneider first testified that the October 1, 2002 agreement was for dilution protection, but later testified that the initial grant was not protected from dilution, but that he and Selkoe agreed, on September 16, 2003, that the seven percent grant would be non-dilutive, retroactive to October 1, 2002. As to the second dilution agreement regarding the warrants, Karmaloop states that in his Verified Counterclaims, Sneider asserts that it was reached on December 31, 2003, but in his answers to interrogatories Sneider puts the date as January 1, 2003. In his deposition, however, Sneider testified that it was made on September 16, 2003.[7]
It is also true, as Karmaloop contends, that much of Sneider’s evidence with respect to the dilution protection agreements is his own uncorroborated testimony, both at deposition and in answers to interrogatories. However, Exhibit A to the company’s Tenth Amended and Restated Operating Agreement notes that Sneider received 117,310 units for dilution protection on September 16, 2003.[8] While these units are part of the 871,109 units that the defendants do not, for the purposes of this motion,[9] contest, a reasonable jury could find that, implicit in the award was the intention to continue to protect Sneider’s seven percent equity from future dilution. A jury could also find that Selkoe’s handwriting on a spreadsheet that Sneider prepared, dated 1/14/04, indicated that Selkoe had agreed to Sneider’s calculation of his ownership percentage. See Exh. 9, Selkoe depo. 166; Exh. 26, Bates no. AS 1000. With respect to the warrants, by email to Sneider dated November 30, 2005, Selkoe suggests a resolution of the parties’ dispute pursuant to which Sneider would transfer to him some of his warrants and keep his 1.66% “and it is no longer non-dilutive.” Exh. 21, Bates no. K07222. From this statement, a jury could conclude that the warrants were protected against dilution.
Karmaloop responds that “periodic” allocations of units are not conclusive evidence of a separate dilution agreement meant to operate in perpetuity. Perhaps, but this argument, as well as the discrepancies in Sneider’s testimony, raise issues of intent and credibility thát must be reserved for the trier of fact. See, e.g., Kanamaru v. Holyoke Mut. Ins. Co., 72 Mass.App.Ct. 396, 407 (2008). While the above evidence may only be a toehold to establish the existence and substance of the dilution agreements, a toehold is sufficient to survive a motion for summary judgment. Marr Equipment Corp. v. I.T.O. Corp., 14 Mass.App.Ct. 231, 235 (1982). The court concludes that, on the summary judgment record before it, a reasonable jury could find that Selkoe and Sneider had agreed that Sneider’s seven percent equity ownership and certain warrants would be protected from dilution going forward.
Count III: Breach of “Duty” of Good Faith and Fair Dealing
Count III asserts a breach of the “duty” of good faith and fair dealing. The court assumes that in this count Sneider is referring to the covenant of good faith and fair dealing that is implied in eveiy contract. “The covenant is preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract... The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.” Uno Restaurants v. Boston Kenmore Realty Corp., 441 Mass. 376 (2004). In this case, the terms of the anti-dilution agreement are oral and very much in dispute. Indeed, its existence is in dispute. The covenant cannot be used to create contract rights that the parties have not agreed to, but with the precise terms of the contract in dispute, it cannot be said that if the jury were to find that there was a contract of some sort, it could not also find that, depending on the terms of that contract, the covenant had been breached. For example, if the jury were to conclude that Karmaloop had agreed that Sneider would own *460 seven percent of Karmaloop forever, the covenant might be breached if Karmaloop failed to issue Sneider additional shares when it issued shares to other parties, even though that specific requirement to issue shares to Sneider whenever shares were issued to others was not contained in the oral contract. Therefore, summary judgment will not issue dismissing this claim.
Count IV: Tortious Interference with a Contractual Relationship
Count IV asserts a claim for tortious interference with a contractual relationship. To establish a claim for tortious interference with a contractual relationship, a plaintiff must show that “(1) he had a contract with a third party; (2) the defendant knowingly induced that third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed as a result of the defendant actions.” Draghetti v. Chmielewski, 416 Mass. 808, 816 (1994).
Sneider, in essence, alleges that Selkoe interfered with his dilution protection contract with Karmaloop by refusing to cause Karmaloop to grant him additional units and warrants and, thereby, to protect Sneider’s ownership interest in Karmaloop from dilution. According to Sneider, Selkoe orally agreed, on Karmaloop’s behalf, that Karmaloop would issue to him 117,310 units to protect his percentage ownership interest in Karmaloop from dilution so that he would continue to own seven percent of Karmaloop and, going forward, Karmaloop would continue to issue additional units to him to protect his equity from dilution. For his part, Selkoe denies that he bound Karmaloop to an oral anti-dilution contract with Snei-der. The parties agree that there is no written documentation of the alleged anti-dilution agreement and no one else was present when the oral contract was allegedly formed.
If Selkoe tortiously interfered with the contract, it was by denying that the anti-dilution contract existed and thereby causing Karmaloop to breach the contract by failing to issue additional units or warrants to protect Sneider’s interest from dilution. The defendants argue that, for these purposes, Selkoe was indistinguishable from Karmaloop, and, as stated in Harrison v. NetCentric Corp., a parly cannot be held liable for interference with its own contract. 433 Mass. 465, 477-78 (2001), citing Appley v. Locke, 396 Mass. 540, 543 (1986). In this case, logic certainly supports the defendants’ position. “[A] tortious interference claim [cannot be asserted] against an individual decision maker who is indistinguishable from the corporation itself.” Id. Sneider’s claim is manifestly premised on Selkoe’s authority unilaterally to bind Karmaloop to an agreement with Sneider, without the advice or consent of any other unit owner, so fundamental to the structure of Karmaloop that Sneider’s seven percent ownership interest in Karmaloop would be protected from dilution regardless of the future valuation of the company, the amount of equity invested by others, and the need to provide employees with the opportunity to participate in the ownership of the company. At the same time, Sneider asserts that Selkoe is separate and distinct from Karmaloop so that his denial of the existence of this oral contract constitutes a tortious interference in the contract between Sneider and Karmaloop. Logic suggests that Sneider cannot have it both ways.
This particular fact pattern is quite different from that found in existing case law on this subject, in which the appellate courts have considered whether corporate officers could be liable for interfering with contractual/advantageous relations between the plaintiff and the corporation. See, e.g., Blackstone v. Cashman, 448 Mass. 255, 260 (2007); Harrison, 443 Mass, at 476-79; Weber v. Comm. Teamwork, Inc., 434 Mass. 761, 781-83 (2001); Wright v. Shriners Hosp.Jor Crippled Children, 412 Mass. 469, 476 (1992); Gram v. Liberty Mat. Ins. Co., 384 Mass. 659, 663-65 (1981). Those cases have generally involved some corporate manager interfering with an employment relationship between plaintiff and the corporation by inducing the decision-maker with regard to plaintiffs employment to take action against the plaintiff. See Blackstone, 448 Mass, at 260; Weber, 434 Mass, at 761.[10] Here, Selkoe did not induce anyone else to breach the alleged anti-dilution contract, he just denied that he entered into that contract on behalf of Karmaloop, with the result that the company did not issue Sneider additional units/shares. Compare Blackstone, 448 Mass, at 260; Harrison, 443 Mass, at 478.
In any event, the court need not struggle with the question of whether, for the purposes of binding Karmaloop to an oral anti-dilution contract or denying that he did so, Selkoe is the alter ego of Karmaloop, because Selkoe is, at the very least, a corporate officer acting in that capacity with respect to the anti-dilution contract, and the summary judgment record clearly establishes that Selkoe did not act with the requisite improper motive or means with respect to Sneider. See id. To prove the element of improper motive or means when the defendant is a corporate officer and the plaintiffs contract is with the corporation, the plaintiff must demonstrate that the officer acted with “actual malice ... a spiteful, malignant purpose, unrelated to the legitimate corporate interest.” King v. Driscoll, 428 Mass. 576, 587 (1994). Stated differently, a corporate officer will not be liable for tortious interference when his or her actions were motivated by a legitimate corporate interest. The policy reason underlying this important element of claims of this nature is to ensure that corporate officers’ “freedom of action directed toward corporate purposes [is not] curtailed by fear of personal liability.” Gram, 384 Mass, at 663-64, quoting Steranko v. Inforex, Inc., 5 Mass.App.Ct. 253, 262 (1977). Otherwise, corporate officers obligated to pro *461 tect the interests of the corporation and its shareholders could be inhibited from acting in the best interests of the constituencies that they serve. Consequently, personal gain, including financial gain, and personal dislike are not sufficient to satisfy the improper interference requirement under these circumstances. Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990).
Sneider argues that Selkoe induced Karmaloop not to issue him additional units to protect Selkoe’s equity in the company and because of personal spite and malice, and without any legitimate business purpose. See King, 412 Mass, at 587. The corporate purpose behind Selkoe’s actions is, however, self-evident. Granting Sneider all of these additional units would have diluted all of the other shareholders’ equity and, even more notably, cost Karmaloop several millions of dollars of cash through the repurchase offer. Selkoe’s animosity toward Sneider does not negate the obvious corporate purpose in not granting Sneider more units than Selkoe maintains Sneider was entitled to. See Blackstone, 448 Mass, at 270; Geltman, 406 Mass, at 817.
The circumstances of this case are a paradigm example of the importance of protecting corporate officers from potential personal liability when they act in furtherance of the legitimate interests of the corporation. See Gram, 384 Mass, at 663-64. In this case, Selkoe denies ever having entered into the oral agreement and no written documentation or other extrinsic evidence of this agreement exists. Selkoe ought not be at risk for personal liability were a jury to find that a contract had been formed, as this could influence his willingness to accept that risk when acting in furtherance of legitimate corporate objectives and for the benefit of all the other shareholders. See Wright, 412 Mass, at 476.
Count V: Tortious Interference with Advantageous Business Relations
In Count V, Sneider asserts that Selkoe and Mastrangelo improperly interfered with Sneider’s advantageous business relationship with Karmaloop. The elements of a claim for tortious interference with advantageous business relations are substantially similar to the elements of the Count IV claim, except that a plaintiff must prove that he had an advantageous business relationship with a third party, rather than a contract. Weber, 434 Mass, at 781; Shqfir v. Steele, 431 Mass. 365, 370 n.10 (2000); Cavicchi v. Koski, 67 Mass.App.Ct. 654, 657 (2006). In this context, the court has generally defined “advantageous business relationship” as an existing business relationship or contemplated contract or business relationship with probable economic benefit. See Comey v. Hill, 387 Mass. 11, 19 (1982); Cavicchi, 67 Mass.App.Ct. at 657; Kurker v. Hull, 44 Mass.App.Ct. 184, 191 (1997). Sneider’s claim implies that he had an advantageous business relationship with Karmaloop in consequence of his ownership interest in the company and his right to participate in the repurchase offer, and it was that advantageous relationship with which Selkoe and Mastrangelo interfered when Selkoe refused to allow Sneider to participate in the repurchase offer.
At the time of the repurchase offer, Sneider’s only relationship with Karmaloop was as a shareholder of the corporation. “It is well settled that a stockholder’s rights between himself and the corporation . . . are contractual.” Crocker v. Watham Watch Company, 315 Mass. 397, 402 (1942). That is not an advantageous relationship as defined by the case law. Compare Comey, 387 Mass, at 19. An advantageous business relationship suggests the probable future development of a business relationship that will foster some financial advantage. Sneider’s right as a stockholder to participate in the repurchase offer is not an advantageous business relationship as defined in any case to which the court has been directed.
Moreover, even assuming that Sneider did have an advantageous business relationship with Karmaloop, the defendants’ actions do not constitute tortious interference, because they acted with a legitimate corporate purpose. See Blackstone, 448 Mass, at 255; Harrison, 443 Mass, at 478. As in Count IV, Sneider must prove that Selkoe and Mastrangelo acted with a spiteful, malignant purpose, unrelated to a legitimate business purpose, when they did not allow Sneider to participate in the repurchase offer. See Blackstone, 448 Mass, at 255. As with Sneider’s claim for interference with contractual relations, the summary judgment record establishes a legitimate corporate purpose for the defendants’ actions—limiting the number of shares Sneider claims to own, thereby protecting the equity interests of all other shareholders and limiting the amount of cash Karmaloop must pay him in connection with the repurchase offer.[11]
Count VI: Breach of Fiduciary Duties
Sneider alleges that: “By denying that Sneider owns 871,109 units in Karmaloop and freezing Sneider out of the Company’s stock repurchase program, in or about July 2008, G. Selkoe and Mastrangelo breached their fiduciary duties to Sneider.” Compl. par. 196. The court begins its analysis of this claim by considering whether either Mastrangelo or Selkoe owed Sneider a fiduciary duly. The court turns first to Mastrangelo.
Mastrangelo was Karmaloop’s general counsel. In that capacity, he was counsel for and owed fiduciary duties to the company, but not to individual shareholders. See Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 522 (1989) (attorney for the corporation does not become attorney for the officers and shareholders). The instant case is also clearly not one in which Mastrangelo gave Sneider reason to believe that Sneider could rely on him for legal advice or services. See Lomare v. Basbanes, 418 Mass. 274, 276 *462 (1994). To the contrary, Sneider maintains that he and Mastrangelo had an antagonistic relationship with one another since late 2005.
At the time of the conduct that Sneider alleges breached fiduciary duties owed to him, according to Sneider, Mastrangelo owned 829,842 shares of Karmaloop.[12] The court has had difficulty discerning what percentage of Karmaloop shares outstanding that represented, but clearly it was a minority interest of well under ten percent. Sneider argues that, nonetheless, under the principles first announced in Donahue v. RoddElectrotype Co., 367 Mass. 278, 593 (1975), as a minority shareholder in a closely held corporation Mastrangelo owed Sneider fiduciary duties of good faith and loyally. That rule, however, applies to Massachusetts corporations and, as of, July 14, 2008, Karmaloop LLC, the Massachusetts limited liability company, had merged with and into Karmaloop, Inc., a Delaware corporation. It was only after that merger, which was part of the transaction in which Insight agreed to invest $30 million in the company, that the repurchase offer was announced to shareholders in August. And, “Delaware law does not impose the heightened fiduciary duly of utmost good faith and loyalty on shareholders in a close corporation.” Harrison, 433 Mass, at 469, citing, Riblet Prods. Corp. v. Nagy, 683 A.2d 37, 39 (Del. 1996). Moreover, “only one State should have the authority to regulate a corporation’s internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . Traditionally, [the Supreme Judicial Court has] applied the law of the State of incorporation in matters relating to the internal affairs of a corporation (including both closely and widely held corporations), such as the fiduciary duty owed to shareholders.” Id, at 470 (internal quotation marks and citations omitted). Whether Sneider owns shares in Karmaloop, Inc., and, therefore has a right to participate in the repurchase offer to the same extent as other shareholders, is a matter governed by Delaware law.
Sneider’s response to these well settled principles of corporate law is to cite Demoulos v. Demoulas Super Mkts., Inc., 424 Mass. 501, 511 (1997), in which claims arose out of a lengthy series of occurrences spanning many years, including periods when the corporation at issue was organized under the laws of Delaware and more recent years after the corporation had been merged into a Massachusetts corporation. The Supreme Judicial Court applied a functional approach to the choice of law issue and applied Massachusetts law to all the claims. In Harrison, however, the Supreme Judicial Court confirmed that Demoulas was an exceptional case, and the Court would generally adhere to the policy that “the State of incorporation dictates the choice of law regarding the internal affairs of a corporation.” 433 Mass, at 471. Moreover, the principal act which has fostered this law suit was Karmaloop’s refusal to permit Sneider to participate in the repurchase program. It is clear that, at that point, Sneider was asserting that he owned 871,109 shares of Karmaloop, Inc. and had the right to tender 40% of those shares to Karmaloop, Inc. for repurchase at the same price as other shareholders. This dispute could have occurred no earlier than August 8, 2008, when other shareholders were given notice of the repurchase program. By then, Karmaloop had been merged with and into a Delaware corporation, as required by Insight as a condition of its $30 million investment—the investment which funded the repurchase offer. Certainly Insight, and the directors elected by the preferred shareholders following the merger and investment, would expect the internal affairs of Karmaloop and their obligations to its shareholder to be governed by Delaware law; and only one State law can be applied to all Karmaloop’s shareholders, officers, and directors.[13]
Finally, while not determinative, the court notes that at the time of the repurchase offer Mastrangelo held a small interest in Karmaloop in comparison to Greg Selkoe, especially if all of the members of the Selkoe family are viewed as a shareholder group, and Insight. Mastrangelo’s principal role at Karmaloop was general counsel. He had no capacity to control the actions of the company, and as Sneider concedes, it was Selkoe who denied having entered into agreements on behalf of Karmaloop to grant Sneider all of the units/shares to which Sneider claims entitlement. Sneider does not assert that Mastrangelo was even present at any of the meetings when these agreements were formed. Indeed, the only evidence in the summary judgment record concerning Mastrangelo’s involvement in the decision not to permit Sneider to participate in the repurchase offer was his presence at a meeting attended by Karmaloop management, representatives of Insight and outside counsel. The fact that Mastrangelo owned a minority interest in Karmaloop at the time he attended that meeting ought not be enough to support a claim for breach of fiduciary duty, certainly under Delaware law, and probably Massachusetts law as well.
Selkoe, as CEO of Karmaloop and a principal shareholder, in particular when the shares of his wife and father are aggregated with his, stands on different footing. Selkoe owes fiduciary duties to all shareholders, including Sneider. These duties do not arise out of any contract with Sneider to which Selkoe may have bound Karmaloop, but out of Selkoe’s obligations as a member of a majority group of shareholders[14] and as the senior officer of the company. A bad faith refusal to allow Sneider to participate in the repurchase offer with respect to shares that Sneider indisputedly owned may constitute a breach of fiduciary duty owed Sneider by Selkoe.[15]
Count VII: Conversion
Count VII asserts a claim for conversion. Unlike the other counts, it does not specify the defendants *463 against whom the claim is asserted, although it appears to pertain to all three defendants. Applying the law of conversion to the facts of this case is like trying to fit a square peg in a round hole. Sneider cites Hall v. Paine, 224 Mass. 62 (1916), for the proposition that wrongful interference in one’s right to possess shares of stock'will support a claim for conversion. Of course, that case stands for the proposition that a stock broker who sells shares entrusted to him for a particular purpose, “in effect [converted them] to his own use.” Id. at 66-67. In this case, nothing of that sort occurred. Rather, Selkoe[16] has asserted that Sneider is not entitled to the shares in Karmaloop that Sneider maintains he was granted and that they were never issued to him. No one has asserted dominion or control over Sneider’s alleged shares; Selkoe maintains that Karmaloop never issued them. See Cahaly v. Benistar Property Exch. Trust Co., 68 Mass.App.Ct. 668, 679 (2007). There is no evidence that Selkoe ever possessed the shares much less disposed of them.[17] The court could not order Selkoe to return Sneider’s shares because he does not have them, nor turn over to Sneider the proceeds from their disposition, because he never disposed of them. If Sneider proves his claims for declaratory relief and/or breach of contract, the shares will be issued by Karmaloop and Sneider will have the rights accorded a shareholder, including the right to participate in the repurchase offer. If Sneider fails to prove his contract claim there can be no conversion because he was not entitled to the shares. Karmaloop cannot have converted shares in itself, and if it could, the remedy would be the same as that provided in the declaratory judgment and breach of contract counts, the issuance of shares to Sneider. The count for conversion is dismissed.
Count VIII: Abuse of Process
A claim for abuse of process requires that “(1) ‘process’ was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.” Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010). There is no claim for abuse of process when process is being used for its intended purpose. Psy-Ed Corp. v. Klein, 459 Mass. 697, 715 (2011), quoting Restatement (Second) of Torts, §682, comment (b). Rather, the claim requires that process be used to obtain a collateral advantage, not involved in the proceeding itself. Klein, 459 Mass, at 713-14. The decision to litigate a dispute does not establish an “ulterior purpose,” even if the claims are baseless. Id. at 715.
To support his claim for abuse of process, Sneider argues that the defendants’ use of process was intended to pressure him into surrendering his equity interest in Karmaloop. The defendants respond that process was used to request a judicial determination of the number of units in Karmaloop actually owned by Sneider, which they contend is far less than Sneider asserts. See Klein, 459 Mass, at 715. The relief sought in the litigation is, thus, identical to the “ulterior purpose” Sneider ascribes to the defendants: a reduction in the number of shares that Sneider asserts that he owns. See id.
The case law makes clear that the fact that defendants may have a coincident motive of ill will toward Sneider, or the hope of personally benefiting from the outcome of the proceeding, is irrelevant, because it does not represent an attempt to gain an advantage collateral to the purpose pled in the complaint. See id. at 714. Furthermore, even if the defendants’ claims against Sneider are without any factual basis and therefore without merit, that is insufficient to establish an ulterior purpose. See id. If Sneider’s position is upheld in the instant action, i.e., Sneider wins and the defendants lose this law suit, the law provides opportunities for relief, but those claims are premature until defendants’ claims are adjudicated against them. See, e.g., Millenium Equity v. Mahlowitz, 73 Mass.App.Ct. 29, 35-36 (2008) (distinguishing claims of abuse of process from malicious prosecution: “When process is employed for the purpose for which the law intends its use, no abuse of process occurs even though the person using the process may have an improper motive in addition to his lawful intention ... To prevail on a claim for malicious prosecution, a plaintiff must establish that he was damaged because the defendant commenced the original action without probable cause and with malice, and that the original action terminated in his favor” (internal quotation marks and citations omitted)). In consequence, Sneider’s contention that the defendants filed this action without a basis in fact, maliciously, and to cause Sneider to give up some of his shares in Karmaloop would state a claim for malicious prosecution and, perhaps, a right for relief under G.L.c. 261, §6F, but those claims cannot be asserted until after the case is adjudicated in Sneider’s favor. See id.
ORDER
For the foregoing reasons, Mastrangelo’s motion is ALLOWED and Karmaloop’s and Selkoe’s motion is ALLOWED, in part, and DENIED, in part, as follows: Counts I, IV, V, VII, and VII are dismissed, and Count VI is dismissed as to Mastrangelo only.

The company was financially secure enough to pay Snei-der $50,000 in cash in 2004 and 2005, and another $125,000 in 2005 and 2006.

Selkoe, Mastrangelo, and Karmaloop will be referred to collectively as the defendants.

It appears (although not well documented) that the exercise price on all warrants issued by Karmaloop during this period was one cent per unit. The court frankly does not understand why Karmaloop would grant warrants with a nominal strike price of one cent, as opposed to simply issuing additional shares in the company to the recipients of the warrants. The economic cost of exercising the warrants was so minimal that no capital would be raised on their exercise, nor would the exercise price require much economic commitment to Karmaloop on the part of the warrant holders.

Sneider points to a promissory note issued to Selkoe for $93,850 that permitted Selkoe to convert the note to units; excessive equity compensation paid to the Selkoes and Mastrangelo; an improper 2004 Employee/Consultant Bonus Plan granting Selkoe, Dina Selkoe, and Mastrangelo various additional interests in Karmaloop if the company was sold; and payment of equity to Dennis Selkoe and Mastrangelo as compensation for their guaranteeing certain loans to Karmaloop.

Karmaloop’s complaint asserts additional claims against Sneider for: breach of fiduciary duly (Count I); breach of duty of good faith and fair dealing (Count II); money had and received (Count III); conversion (Count IV); fraudulent concealment (CountV); tortious interference with advantageous business relationships (Count VI); and professional malpractice (Count VII).

Sneider moved to amend his counterclaims to assert derivative claims on behalf of Karmaloop against the defendants and others, as well as the claims now pled in the Amended Verified Counterclaims. So much of the motion as sought leave to assert derivative claims was denied [26 Mass. L. Rptr. 486 (Connolly, Thomas E., J.)]. The Court notes that Sneider’s Amended Verified Complaint is “anything but short and plain,” Schaer v. Brandéis Urdu., 432 Mass. 474, 477 (2000), containing 211 paragraphs, spanning 38 pages. See also Driscoll v. Board of Trustees of Milton Academy, 70 Mass.App.Ct. 285, 299 (2007).

Karmaloop relies on O’Brien v. Analog Devices, Inc., 34 Mass.App.Ct. 905, 906 (1993), for the proposition that a party cannot create a disputed issue of fact by affidavit statements contradicting testimony previously made under oath at a deposition. Karmaloop’s reliance is inapposite. In this case, the facts are disputed not because Sneider has submitted an affidavit that contradicts his deposition testimony, but rather because his deposition testimony is internally inconsistent. See, e.g., NgBrothers Const, Inc. v. Cranney, 436 Mass. 638, 648 (2002).

For the purposes of this motion only, the defendants do not contest the authenticity of this document.

Karmaloop also concedes, for the purposes of this motion, that some of those units were grants for dilution protection.

Notably, in these cases the corporate officer was not found liable for tortious interference, because the presence of a legitimate corporate purpose for the act complained of precluded a finding of actual malice. E.g., Blackstone, 448 Mass, at 260; Harrison, 443 Mass, at 479; Weber, 434 Mass, at 783; Wright, 412 Mass, at 476; Gram, 384 Mass, at 665.

Mastrangelo argues that his involvement in the decision not to allow Sneider to participate in the repurchase offer decision was solely in his capacity as legal counsel to Karmaloop. Sneider contends that Mastrangelo was part of the “collective decision” to exclude Sneider from the repurchase offering made by management. The question as to whether Mastrangelo was acting solely in his capacity as legal counsel to Karmaloop need not be reached because Sneider cannot satisfy the actual malice requirement for tortious interference. The same analysis applies to Mastrangelo as Selkoe regarding his alleged interference with Sneider’s advantageous business relationship with Karmaloop. See Blackstone, 448 Mass, at 260. Assuming that Mastrangelo participated in the “collective decision” to exclude Sneider and was not solely providing legal advice, there is still no evidence that Mastrangelo’s actions were driven by a spiteful, malicious purpose, unrelated to a legitimate corporate interest. See Wright, 412 Mass, at 476. Even if the record demonstrates that Mastrangelo was also influenced by his dislike of Sneider, that would not be enough to support a finding of improper interference because Mastrangelo, like Selkoe, is entitled to protection from liability for actions relating to the legitimate corporate interest of protecting all other shareholders and saving Karmaloop a significant amount of money. See Gelt-man, 406 Mass, at 817.

 ^he court has had a difficult time finding documentation of the dates on which Mastrangelo acquired his Karmaloop interests.

This is not a case in which the company was reorganized as a Delaware corporation for the purpose of eliminating claims against minority shareholders. Compare Billings v. GTFM, 449 Mass. 281, 293 (2007) (holding that when a shareholder loses his ownership interest in a corporation as a result of a corporate transaction his derivative claims expire unless the transaction was “fraudulent and done merely to eliminate derivative claims”).

See Amadeus Global Travel Distribution, SA v. Orbitz LLC, 302 F.Sup.2d 329 (D.Del. 2004) (where the court held, applying Delaware law, “consanguinity” among shareholders may establish a shareholder group).

Sneider’s opposition to the instant motion argues that Sneider has direct claims for breach of fiduciary duty against Selkoe and Mastrangelo as a consequence of the number of shares and warrants granted members of Karmaloop management during the period 2005 to 2007 as compensation for services or personal guarantees of loans. Sneider cites Gentile v. Rosetti, 906A.2d91 (Del. 2006), and Judge Billings’s recent decision, Sanderson v. Verdasys, 31 Mass. L. Rptr. No. 1, 22 (April 1, 2013), in support of his contention that claims of breach of fiduciary duty against majority shareholders can be direct as well as derivative. Those shareholder class actions, however, involved transactions in which the controlling shareholder caused “the corporation to issue ‘excessive’ shares of its stock in exchange for assets of the controlling stockholder that have a lesser value." Gentile, 906 A.2d at 100. They do not stand for the proposition that every claim by a shareholder that management has committed waste by overcompensating itself for its services with shares, options or salary is direct as well as derivative. Such claims of corporate waste continue to be derivative. See, e.g., In re Goldman Sachs Group Inc. Securities Litigation, Del.Ch.Ct., October 12, 2011. Indeed, in this case such conduct would, in theory, require a determination of the degree of over-compensation and the cancellation of such wasteful shares and warrants: a benefit to the corporation and incidentally to all shareholders, but not grounds for an award of shares to Sneider and the right to participate in the repurchase offer. In fact, Sneider’s principal factual contention—he has a non-dilution contract with Karmaloop requiring that he be granted sufficient shares to maintain his ownership interest in Karmaloop regardless of how many shares and options management grants itself—is factually inconsistent with a claim that this alleged conduct gave him a direct claim against Selkoe (or Mastrangelo) for corporate waste. And, consistent with his claim of an oral anti-dilution contract, as noted above, the breach of fiduciary duty claim actually pled in the Amended Verified Counterclaims expressly states that it is based on a wrongful denial that Sneider owns 871,109 shares and refusal to permit him to participate in the repurchase offer.

There is no evidence that Mastrangelo converted Sneider’s shares, but rather that Selkoe denied that he ever entered into the agreements with Sneider on which Sneider bases his claims.

There is no evidence that there were insufficient authorized Karmaloop units and shares and Selkoe or Mastrangelo took Sneider’s.