NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-101                                          Appeals Court

KILNAPP ENTERPRISES, INC.[1] vs. MASSACHUSETTS STATE AUTOMOBILE
DEALERS ASSOCIATION & others.[2]

No. 15-P-101.

Suffolk.     December 7, 2015. - March 17, 2016.

Present:  Rubin, Maldonado, & Massing, JJ.

Libel and Slander.  Actionable Tort.  Practice, Civil, Motion to
      dismiss.

Civil action commenced in the Superior Court Department on
March 10, 2014.

A motion to dismiss was heard by Judith Fabricant, J.

Travis J. Jacobs for the plaintiff.
Alan D. Rose, Sr., for Fisher & Phillips LLP & another.
James F. Radke for Massachusetts State Automobile Dealers
Association.

RUBIN, J.  This is an action for defamation brought by

Kilnapp Enterprises, Inc., doing business as Real Clean (Real

Clean), which describes itself as "a broker for automobile

_____

      [1] Doing business as Real Clean.

      [2] Fisher & Phillips LLP and Joseph Ambash.

detailing and reconditioning between service providers and automobile dealerships."[3]  Real Clean brought this action against the Massachusetts State Automobile Dealers Association (MSADA) for its published statements concerning an investigation by the United States Department of Labor (DOL) into the practices of automobile detailing "brokers" including Real Clean.  The complaint asserts not only a claim for defamation, but includes several other related counts that will be described more fully below.  It names as a defendant not only MSADA but the author of the published statements, Attorney Joseph Ambash, and his law firm, Fisher & Phillips LLP.  The defendants brought a motion to dismiss under Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), which was allowed.  Real Clean appeals.

Because the materials properly considered by the judge in the Superior Court demonstrate that Real Clean will be unable to prove that the defendants' statements were materially false under the applicable standard, which requires demonstration that actionable statements have been made with knowledge of their falsity or in reckless disregard of their truth or falsity, we affirm the judgment dismissing all of Real Clean's claims.

Background.  Our review of the allowance of a motion to dismiss is de novo.  Glovsky v. Roche Bros. Supermkts., Inc.,

___

[3] Automobile detailing involves the thorough cleaning of the interior and exterior of passenger vehicles.

469 Mass. 752, 754 (2014). For purposes of reviewing the allowance of a motion to dismiss we must, of course, take all the allegations in the plaintiff's operative complaint, here the amended and verified complaint filed on May 7, 2014, as true. Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). While the original complaint has seven documents appended to it, including a January 2, 2014, letter from Real Clean's counsel, Stephen Gordon, to the executive vice-president of MSADA (Gordon letter) and Ambash's response thereto, the amended complaint replaced the Gordon letter with an affidavit from Real Clean's general manager. Nevertheless, the amended complaint still appended the response to the Gordon letter and contained allegations referring to the existence of the Gordon letter. A reviewing court, like the judge initially evaluating and ruling upon a motion to dismiss, is entitled to consider materials not appended to the complaint, but referenced or relied upon in the complaint. See Harhen v. Brown, 431 Mass. 838, 839-840 (2000), citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004). We recite the facts as alleged in the complaint, supplemented by that factual information contained in these filings that were properly considered by the trial judge.

Real Clean describes itself as a company that "connect[s]" automobile dealerships with "independent contractors" who provide automobile detailing and reconditioning services (service providers). According to the complaint, Real Clean has formed relationships with hundreds or thousands of automobile dealerships in Massachusetts and New England and is one of the largest brokers of automobile detailing and reconditioning services in the Commonwealth. In 2013, the DOL was conducting an investigation into potential violations of wage and hour laws by Real Clean and others in the automobile detailing business. The complaint and other documents properly before the judge indicate that with respect to Real Clean, the DOL investigation focused on two relationships. First, it focused on whether Real Clean in fact employed the individuals nominally employed by the service providers (detailers), and thus owed them overtime pay. Second, it focused on whether the relationships Real Clean brokered -- between the dealerships and the service providers -- in fact amounted to employment relationships between the dealerships and the detailers, and whether therefore the dealerships owed the detailers overtime pay. According to the Gordon letter, the DOL "advised Real Clean that the DOL felt that Real Clean owed many individual detailers overtime pay." According to the complaint, "[the DOL] has attempted to tie the dealership[s] to the independent contractors . . . who employ

the detailing and reconditioning personnel."  In April, 2013, Real Clean met with the DOL and provided materials purporting to refute the DOL's conclusions.  Between the time of those meetings and at least the time of the Gordon letter, no enforcement actions were brought against Real Clean.  Nonetheless, according to the Gordon letter, the DOL did visit automobile dealers, including some who are Real Clean customers, and assessed amounts claimed to be due from the dealers, some of whom paid the assessment.

In November, 2013, MSADA published a newsletter featuring an article written by defendant Ambash entitled "Alert:  DOL Cracking Down on Dealers Using Real Clean."  A nearly identical article appeared on MSADA's Web site on November 13, 2013, where it was entitled "DEALER ALERT: U.S. DEPARTMENT OF LABOR CONTINUES AUDITS OF AND ACTIONS AGAINST DEALERS AND REAL CLEAN." The text of the first of these articles is as follows:

> "We have learned that the Department of Labor has approached several dealers in the past couple of weeks and demanded payment of overtime for detailers working for Real Clean (Kilnapp Enterprises).  The amounts range from a few thousand to tens of thousands of dollars.  In some cases the DOL has asked the dealer to pay 'liquidated damages,' meaning a penalty equal to the total back pay owed.

> "This is a serious situation for dealers who have relationships with Real Clean, and it will only get worse.

> "As we have previously reported, the DOL has been visiting dealerships for months, demanding to interview dealership employees and Real Clean employees.  Their

primary objective has been to tie the dealerships to Real Clean, in order to claim that the dealership is a 'joint employer' of the Real Clean personnel.  After the DOL completes its investigation, which typically also covers [Fair Labor Standards Act] compliance for the dealership employees, the DOL schedules a 'closing conference' and demands backpay and overtime it claims is owed both to any dealership employees who were improperly paid, as well as to employees of Real Clean.

"The dealers, of course, do not employ any of the Real Clean employees directly, nor do they supervise or control their work.  Under the brokerage arrangement with Real Clean, the dealer pays a fee directly to Real Clean for detailing or reconditioning each car, and Real Clean is exclusively responsible for paying its employees and contractors.

"The DOL claims that the Real Clean contractors are not independent, but are 'jointly' employed by the dealer and either Real Clean or the contractor.  Therefore, the DOL says the dealers are responsible for monitoring their hours and pay, and making sure they are paid minimum wage and overtime.

"When the dealers explain to the DOL that they have no knowledge of or control over the Real Clean personnel, the DOL often threatens them with liquidated damages or legal action if they don't pay the money, which covers alleged back pay for two years.

"Even if a dealer decides to pay the DOL, that does not relieve the dealer of liability, because each day Real Clean employees are not paid overtime or minimum wage constitutes a new violation.  The DOL, therefore, can come back again and demand more back pay unless something has changed.

"**What Should Dealers Do?**

"If they feel that the DOL has no legitimate reason demanding money from them for work done by Real Clean employees, dealers have a variety of options to consider, including:

"•   Real Clean has indemnification agreements with some dealers.  It has indicated that it will

consider offering indemnification agreements to all of its dealers. Real Clean is asking the dealers not to agree to pay the DOL, but instead to let Real Clean's lawyers defend them. Real Clean has indicated through its lawyer that it will not reimburse any dealers who choose to pay the DOL directly.

"•    Therefore, dealers have the option of not paying the DOL and permitting Real Clean to defend any lawsuits against them. However, any such offer by Real Clean will not stop the DOL from coming back, or other government agencies like the Attorney General from getting involved. It may also lead to time-consuming litigation. Furthermore, being defended by Real Clean's attorneys might give the impression that there is, in fact, a close relationship between the dealer and Real Clean. And the dealer may have a real dispute with Real Clean, so its lawyer would have a conflict representing the dealer in any event.

"•    Dealers can pay the DOL and end their relationship with Real Clean if they feel the risks are too great. In connection with that, they can demand reimbursement by Real Clean or consider offsetting any amounts paid against monies due to Real Clean.

"•    If a dealer ends its relationship with Real Clean, the dealer can hire detailers directly, and pay them properly as employees of the dealership. Alternatively, a dealer can engage the services of another outside company to provide detailing services. Of course, the dealer should take steps to ensure that the new detailing company is complying with all employment laws, including wage-hour.

"•    Dealers can demand that Real Clean guarantee full compliance with all laws by Real Clean and its contractors, and build in appropriate offsets and penalties against Real Clean if there are violations.

"Each of these options requires careful consideration and involves weighing risks and benefits. The situation is very complicated. Each dealer should consult with counsel to help determine the best course of action for your dealership.

"Fisher & Phillips will continue to monitor the situation and provide advice and guidance to dealers as requested. Please contact Joe Ambash at [telephone number]."

The November 13, 2013, version of the article contained a few minor changes. For instance, the following sentence was added to the end of the second-to-last bullet point: "Even then, there is no assurance that the DOL will not pursue similar claims against other detailing companies."

Discussion. Real Clean filed this action on March 10, 2014. In addition to the defamation count, the complaint also asserted claims for violation of the Lanham Act, 15 U.S.C. §§ 1051 et seq. (2012); violation of G. L. c. 93A; commercial disparagement; and tortious interference with advantageous relations. Because our conclusions about the defamation claim have bearing on some of the other counts, we turn first to it.

The elements of a claim of defamation are "that the defendant was at fault for the publication of a . . . statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss" (footnote omitted). White v. Blue Cross & Blue Shield of Mass., Inc., 442

Mass. 64, 66 (2004). See id. at 66 n.4. The contours of this cause of action have been shaped in large measure by concerns regarding the restrictions that it may impose on freedom of speech. HipSaver, Inc. v. Kiel, 464 Mass. 517, 523 n.7 (2013) ("[T]he common law of defamation has become infused with principles of the First Amendment to the United States Constitution"). Several limitations on the scope of a defamation claim bear upon the validity of the plaintiff's claim.

First, as the parties agree, the statements at issue are actionable only if they are false, and were made when knowingly false or in reckless disregard of their truth or falsity. This is because they are "conditionally privileged." See Retailers Commercial Agency, Inc., petitioner, 342 Mass. 515, 520-522 (1961) ("reports made by a mercantile agency to an interested subscriber [are] conditionally privileged" such that a false report is not actionable unless "made . . . recklessly, without reasonable grounds for believing it was true"). "Under Massachusetts law, a publication will be deemed conditionally privileged if the publisher of the statement and the recipient have a common interest in the subject and the statement is 'reasonably calculated to further or protect that interest.'" Downey v. Chutehall Constr. Co., 86 Mass. App. Ct. 660, 666 (2014), quoting from Sheehan v. Tobin, 326 Mass. 185, 190-191

(1950). This privilege, which antedates the constitutionalization of defamation law that began with New York Times Co. v. Sullivan, 376 U.S. 254 (1964), whether constitutionally required or not, is consonant with the protections for freedom of speech contained in the State and Federal Constitutions.

As relevant here, "Massachusetts courts have recognized that a person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest." Bratt v. International Bus. Machs. Corp., 392 Mass. 508, 512-513 (1984). Thus, in Sheehan, 326 Mass. at 187, the privilege was held applicable to an allegedly false and defamatory statement in an official union magazine sent to all union members asserting that the plaintiffs, two union members, "entered the office of Local No. 25 and brutally assaulted one of the business agents, Francis J. Halloran, a man old enough to be their father. They in turn preferred charges against the officers of the local." The court held that the statement was conditionally privileged because it was "information of general common interest to the members of a labor union [disseminated] by its officers through the medium of the official journal of the union." Id. at 191.

Likewise here, a statement published in a trade association newsletter or on a trade association Web site for dissemination to members of the trade association with a common interest in the matter is actionably defamatory only if it is false, and is made when knowingly false or in reckless disregard of its truth or falsity.

Second, where, as here, falsity is a required element of a defamation claim, to be actionable a statement must be "materially" false. Pan Am Sys., Inc. v. Atlantic N.E. Rails & Ports, Inc., 804 F.3d 59, 66 (1st Cir. 2015). The question of falsity "overlooks minor inaccuracies and concentrates upon substantial truth. . . . Put another way, [a] statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-517 (1991), quoting from Sack, Libel, Slander, and Related Problems 138 (1980).

Third, statements of opinion "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are not actionable. Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990), quoting from Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988).

Applying these principles, we turn to the statements that Real Clean's claims were actionably false.

Real Clean asserts that "the crux of the Publications is that a relationship with [Real Clean] is a recipe for 'serious' negative consequences which will continue to intensify, and all MSADA members would be wise to sever ties with [Real Clean] and contact Defendants Ambash and Fisher & Phillips in doing so." A central contention made by Real Clean is that the publications were misleading because Real Clean was not the only broker of detailing services that was under examination by the DOL.

By its own admission, Real Clean was one of the largest brokers of detailing services to automobile dealerships in Massachusetts. The Gordon letter states that several dealers who were customers of Real Clean had been sent assessments by the DOL and that some had paid these assessments. Consistent with this statement, the defendants' articles asserted that MSADA's counsel had "learned that the Department of Labor has approached several dealers in the past couple of weeks and demanded payment of overtime for detailers working for Real Clean (Kilnapp Enterprises). The amounts range from a few thousand to tens of thousands of dollars. In some cases the DOL has asked the dealer to pay 'liquidated damages,' meaning a penalty equal to the total back pay owed." Real Clean does not claim this statement is false. There can be no doubt that in light of the DOL's activities, MSADA's members who were customers of Real Clean would have been interested to know that

other Real Clean customers had been so assessed.  Cf. Shaari v. Harvard Student Agencies, Inc., 427 Mass. 129, 133 (1998).  The defendants had no obligation to report about any other actions being taken by the DOL with respect to other brokers, and, indeed, if the DOL's treatment of other brokers were relevant, the publications did not suggest that the use of other brokers instead of Real Clean would be a safe harbor.  Each statement indicated that if they chose another company, dealers "should take steps to ensure that the new detailing company is complying with all employment laws."  The November 13, 2013, version of the article noted in addition that "there is no assurance that the DOL will not pursue similar claims against other detailing companies."  The statements about Real Clean were not rendered materially false by the failure to include reference to any other broker or its dealer customers that might also have been subject to the DOL's scrutiny.

Further, even if the case could be made that the publication was false because it mentioned only Real Clean, the allegations are insufficient to show that the defendants wrote the article knowing it to be false or in reckless disregard of its truth or falsity.  There is no allegation in the amended complaint that MSADA was even aware of the fact, if it is true, that other brokers or their dealer clients had been approached by the DOL.

Real Clean also objects to a series of specific statements in the publications. The first is "[t]his is a serious situation for dealers who have a relationship with Real Clean, and it will only get worse."

The first half of the statement, even if viewed as a statement of fact and not opinion, is true. The DOL assessing overtime pay against dealerships, rightly or wrongly, is certainly a serious matter. Real Clean has not alleged that the publications were incorrect in stating that some dealerships had been assessed "thousand to tens of thousands of dollars." The Gordon letter admits that some dealerships had paid the assessments, although it implies that the dealerships who had done so had received assessments of considerably smaller amounts.

The second part of the sentence, asserting that the situation will only get worse is, quite obviously, a statement of opinion based on the author's own professional judgment. "An assertion that cannot be proved false" cannot be actionably defamatory. Cole v. Westinghouse Bdcst. Co., 386 Mass. 303, 312, cert. denied, 459 U.S. 1037 (1982) (quotation omitted). The defendants were entitled to hold this opinion, and its expression cannot form the basis of a defamation claim.

The plaintiff next objects that the article describes those who actually do the detailing work as Real Clean "employees" or

"personnel." To begin with, in the context of a newsletter directed at lay people, we do not think that these terms can be read as legal terms of art. Rather, they are used in their colloquial sense simply to identify the people about whom the author is speaking, i.e., the actual detailers "connect[ed]" to the dealerships by Real Clean. Thus, even if those detailers are not as a legal matter employees or personnel of Real Clean, there is no material falsehood here.

Further, even if these words were read as legal terms of art, they would reflect nothing more than the opinion of the attorney author that the DOL's allegations are well taken. A lawyer's opinion about an unsettled legal question -- in this case whether these detailers were employees of Real Clean -- again cannot form the basis for a defamation claim unless it implies the existence of undisclosed defamatory facts. There was no such implication here.

The plaintiff next complains about the statement that the DOL had attempted to tie Real Clean to dealerships under a joint employer theory. Again, this is not materially false. Whether the DOL's theory was in fact that these dealerships were the detailers' joint employers with Real Clean, or were, in fact, the detailers' sole employers, the important point for the reader is that the DOL sought to subject dealers to assessments for overtime pay for the work done by those detailers on the

basis that the detailers were their employees. "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" Masson, 501 U.S. at 517, quoting from Heuer v. Kee, 15 Cal. App. 2d 710, 714 (1936).

Next, Real Clean objects to the statements that there was a "continuing investigation" into Real Clean. While, as Real Clean contends, there is properly considered material indicating that no assessments had been made against Real Clean through the date of the Gordon letter in January, 2014, there is no allegation in the complaint nor anything in the record that indicates on what date, if any, the investigation of Real Clean ended. In light of this, even if there were no continuing investigation, the properly considered materials before the judge could not support a conclusion that the false statement was made knowingly or in reckless disregard of its truth or falsity.

Finally, Real Clean alleges that to the extent that the over-all impression created by the publications was that the DOL was "targeting" Real Clean's customers, that impression was false. To the extent this argument goes beyond the claim that we have rejected above -- regarding whether the defendants were obligated to make clear that other companies providing detailing services were also under scrutiny by the DOL -- it is without

merit.  The impression that Real Clean's customers were being targeted is not false; it is true.

Because we conclude that there were no false statements actionable in a claim for defamation, and that, read as a whole, the publications were not actionable as defamatory, dismissal of the defamation claim was appropriate.  This conclusion also applies to the commercial disparagement claim, with respect to which the standards regarding falsity and intent are the same.  See HipSaver, Inc., 464 Mass. at 523.

Real Clean's Lanham Act claim fails, if for no other reason, because such a claim may be maintained only against one's competitors, Podiatrist Assn. v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 19 (1st Cir. 2003), and there is no allegation that any of the defendants competes with Real Clean.

Real Clean contends that its claim for tortious interference must be reinstated because it has adequately alleged the use of improper means:  the publication of false statements of fact to the plaintiff's customers.[4]  This argument,

---

[4] The plaintiff's appellate brief does not raise the argument for improper motive raised below:  that Ambash and Fisher & Phillips LLP were motivated by the desire to scare MSADA's members into hiring them.  Because this argument has been abandoned on appeal, we need not address it.  Smith v. Bell Atl., 63 Mass. App. Ct. 702, 725 n.8 (2005) ("An argument that is not raised in a party's principal brief may be deemed waived").

however, is foreclosed by our conclusion that each of the statements alleged to be actionably false is substantially true.

Finally, because Real Clean's G. L. c. 93A claim relies on each of the underlying claims, its dismissal, too, was proper.

<u>Judgment affirmed</u>.