APPEALS COURT 
 
 B.C. CONSTRUCTION CO., INC. vs. JOHNSON ROBERTS ASSOCIATES, INC.

 
 Docket:
 24-P-627
 
 
 Dates:
 March 18, 2025 – October 3, 2025
 
 
 Present:
 Massing, Neyman, & Wood, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Contract, Interference with contractual relations, Bidding for contract, Construction contract. Municipal Corporations, Contracts. Evidence, Motive. Libel and Slander. Privileged Communication. Practice, Civil, Summary judgment.
 
 

       Civil action commenced in the Superior
Court Department on June 7, 2021. 
      The case was heard by Adam L. Sisitsky,
J., on a motion for summary judgment. 
      Kevin P. Polansky (Joseph P. Murphy also
present) for the plaintiff.
      Stephen J. Orlando for the defendant.
      WOOD, J. 
The plaintiff, B.C. Construction Co., Inc. (B.C.), brought this action
against the defendant, Johnson Roberts Associates, Inc. (JRA), alleging
intentional interference with advantageous business relations and
defamation.  A Superior Court judge
granted JRA's motion for summary judgment on both counts and entered a judgment
dismissing the complaint.  B.C. appeals.  We affirm.
      Background.[1]  In 2013, the city of Everett (Everett)
awarded B.C. a contract to renovate and construct an addition to Everett's
library building and selected JRA as the project's architect.  At the end of the project, B.C. submitted
change orders to Everett, increasing the total project cost.  Separately, JRA offered Everett a $20,000
credit for a dispute unrelated to the change orders.
      In 2019, the town of Dracut (Dracut) hired
JRA as the architect for the construction of a new fire station and retained
the Vertex Companies, Inc. (Vertex), as its owner's project manager (OPM).  Vertex and JRA worked together to evaluate
bids for the fire station project, ultimately identifying B.C. as the lowest
bidder.[2]  Vertex sent an e-mail message
to the Attorney General's office (AGO),[3] explaining that it had information
regarding JRA's problematic history with B.C. in connection with the Everett
project, and that Dracut had been informed of other negative experiences with
B.C.  In view of that information, Vertex
asked whether Dracut had the right to reject B.C.'s bid.  The AGO advised that Dracut should
independently gather client reviews of B.C.'s prior projects and, if it found
negative reviews, then it should give B.C. the chance to respond.  The AGO confirmed that after taking these
steps, Dracut would have the right "to reject a low bidder who is not
responsible."  Philip O'Brien, a JRA
principal, and Vertex prepared a report for Dracut's building committee
summarizing B.C.'s municipal project references and the AGO's e-mail message
and ultimately recommending a different bidder for the project.  Dracut's building committee then offered
B.C.'s president, Michael Cresta, an opportunity to meet and address the negative
project reviews.  Following that meeting,
Dracut rejected B.C.'s bid.
      Because of budgeting issues, Dracut had to
delay the project and conduct another round of bidding six months later.  After B.C. submitted a new bid for the
project as the lowest bidder, JRA again reviewed B.C.'s references and
summarized its findings in a report.[4] 
JRA reported that it had contacted some of B.C.'s references from the
first round of bidding and some new references, which generated a mix of
negative and positive reviews.  JRA also
identified a reference from an architect reporting that B.C. was "suing
[the architect] and the [municipal client] for unpaid changes," and that
the municipal client was countersuing B.C. for damages.  Once again, JRA did not recommend B.C. for
the project, and Dracut again rejected B.C.'s bid, this time with no offer to
discuss the negative reviews.
      In late 2019, as Dracut was completing its
second round of bidding, the city of Cambridge (Cambridge) hired JRA as the
architect for the construction of a fire station.  After B.C. submitted one of the lowest bids
for the project, another JRA principal, Jeffrey Davis, sent an e-mail message
to Cambridge's project manager apparently referencing JRA's experience working
with B.C. on the Everett project. 
Davis's message stated that, "[JRA] worked with [B.C.] in 2013/2014
-- if they weren't the worst, they were among the [two] worst [general
contractors] that we have ever worked with. 
As such, we really need to talk to current references to understand if
they still suck."  Davis worked with
a JRA associate, Michael Bellefeuille, to prepare a report summarizing JRA's
bid review (Cambridge report), which included client reviews of B.C.'s prior
work.  Davis also incorporated
information obtained through reference checks and from JRA's previous reports
on the Dracut project.  The Cambridge
report stated that it appeared "that many of [B.C.'s] recently completed
projects may have required formal dispute resolution (including mediation and
litigation) in order to complete the project."  Cambridge rejected B.C.'s bid.
      Not all municipalities, however, reached
the same conclusion with respect to B.C. 
Around the same time as the Dracut and Cambridge projects, the town of
Newbury (Newbury) sought bids to build a new police station.  B.C. was the lowest bidder.  Although JRA was not the architect for the
Newbury project, Newbury's permanent building committee obtained a copy of one
of JRA's reports from the Dracut project, which contained unfavorable information
about B.C.  Vertex, which was the OPM on
the project, nonetheless found that B.C. was a responsible bidder, and Newbury
awarded the job to B.C.
      Discussion.  "The allowance of a motion for summary
judgment is appropriate where there are no genuine issues of material fact in
dispute and the moving party is entitled to judgment as a matter of law"
(quotation and citation omitted). 
Williams v. Board of Appeals of Norwell, 490 Mass. 684, 689 (2022).  When a party moves for summary judgment on
claims that the opposing party will have the burden of proving at trial, the
moving party must demonstrate "that the party opposing the motion has no
reasonable expectation of proving an essential element of that party's
case."  Kourouvacilis v. General Motors
Corp., 410 Mass. 706, 716 (1991).  We
review a grant of summary judgment de novo. 
See Casseus v. Eastern Bus Co., 478 Mass. 786, 792 (2018).
      a. 
Intentional interference with advantageous business relations.  To prevail on a claim of intentional
interference with advantageous business relations, B.C. must prove that
(1) it had an advantageous business relationship with a third party,
(2) JRA knowingly induced the third party to forgo the business relations,
(3) JRA's interference was improper in motive or means, and (4) B.C.
was harmed by the interference.  See
Kelleher v. Lowell Gen. Hosp., 98 Mass. App. Ct. 49, 54 (2020), citing Psy-Ed
Corp. v. Klein, 459 Mass. 697, 715-716 (2011). 
The central question in this appeal is whether there is a genuine
dispute of fact as to whether JRA's actions were motivated by an improper
motive or means that harmed B.C.
      This turns on the application of Cutting
Edge Homes, Inc. v. Mayer, 103 Mass. App. Ct. 749 (2024) (Cutting Edge).  We focus first on improper motive.  "To show an improper motive, what is
required is a showing of an intent specifically to harm the plaintiff,
unrelated to any legitimate business purpose" (emphasis omitted).  Id. at 755. 
See Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658 (2006) (improper
motive "may include ulterior motive [e.g., wishing to do injury]" as
well as "evidence of retaliation or ill will toward the plaintiff"
[citation omitted]).  B.C. argues that
its prior strained relationship with JRA -- evidenced by JRA's comments that it
did not want to work with B.C. following its experience with B.C. on the
Everett project and the fact that B.C.'s bids were rejected on projects where
JRA was the architect but accepted on projects where JRA was not -- creates a
reasonable expectation that B.C. can prove improper motive through ill will.  We disagree.[5]
      As we explained in Cutting Edge, the
critical inquiry is whether there was any evidence that the alleged
tortfeasor's motive or means were "improper," as defined by the
Restatement (Second) of Torts (1979) (Restatement).  Cutting Edge, 103 Mass. App. Ct. at 753.  Articulating what is known as the
"honest advice" rule, section 772 of the Restatement states that
"One who
intentionally causes a third person not to perform a contract or not to enter
into a prospective contractual relation with another does not interfere
improperly with the other's contractual relation, by giving the third person
 
"(a)
truthful information, or
"(b) honest
advice within the scope of a request for the advice."
 
In its comments,
the Restatement reiterates that it is not improper to "merely give[]
truthful information to another." 
Restatement (Second) of Torts § 772 comment b.  Further, the comments explain that the honest
advice rule applies where (1) the advice was requested, (2) the
advice given was within the scope of the request, and (3) the advice was
honest.  Id. at § 772 comment
c.  Advice is deemed "honest"
so long as the advisor exercised good faith. 
See id. at § 772 comment e.
      The summary judgment record before us
established that in each project bid, JRA's municipal client asked it to
provide advice about B.C.  The record
also established that, in each instance, JRA provided advice within the scope
of the request; that is, advice relevant to whether B.C. was a
"[r]esponsible" bidder.  G. L.
c. 149, § 44A (1).  Finally, B.C. has no
reasonable expectation of proving that JRA's advice was not honest because it
failed to demonstrate that there was a genuine issue of fact regarding JRA's
exercise of good faith.  JRA gathered and
summarized multiple reviews -- both positive and negative -- by B.C.'s prior
municipal clients and then relied on that summary as the basis of its opinion
that B.C. was not a responsible bidder.[6]
      We agree with the judge that nothing in
the record supports B.C.'s contention that JRA implied in bad faith that
municipalities had difficulty getting B.C. to finish the construction phase of
projects.  That JRA's negative statements
may have been imprecise does not suggest an improper motive.  For example, B.C. argues that JRA's statement
in the Cambridge report that "many of [B.C.'s] recently completed projects
may have required formal dispute resolution (including mediation and
litigation) in order to complete the project," along with JRA's assertion
to Cambridge's project manager about its negative impression of B.C., creates a
genuine factual dispute about whether JRA acted with improper motive.  However, the record does not support an
inference that JRA's statements about B.C. were made in bad faith.  B.C. argues only that the fee disputes
underlying JRA's statements invariably occurred after B.C. had completed the
construction phase of the projects, and that JRA's failure to identify any
projects that B.C. required litigation to complete establishes that JRA knew
its statements were false.
      In fact, JRA clearly explained the basis
for its statement that many of B.C.'s recent projects "may have required
formal dispute resolution" to complete in the Cambridge report.  Prior to writing that report, JRA spoke with
participants from seven municipal projects that B.C. commenced between 2015 and
2018.  JRA reported that, "Based on
news reports and anecdotal respondent comments, we understand that several
projects resulted in dispute resolution, including litigation and mediation,
between [B.C.] and [o]wners and/or [d]esigners."  JRA reported further that, "Numerous
respondents noted that [B.C.] sometimes performed unauthorized work outside of
the contract requirements." 
Finally, JRA stated that, "Several respondents noted excessive and
unfounded claims for change orders by [B.C.]. 
Several respondents noted that [B.C.] sought additional compensation for
work that was included in the [c]ontract [d]ocuments."  In short, this was relevant information
within the scope of JRA's duty to provide honest advice.  Because JRA's statement that some projects
"may have required formal dispute resolution" to complete was founded
on factual information that it gathered from references and news reports, the record
does not support B.C.'s contention that JRA deliberately made a false claim
about litigation being necessary to complete its projects.[7]
      We also agree with the judge that, even if
JRA's recommendation was influenced by a prior negative experience with B.C.,
which caused bias and greater reliance on negative reviews, that fact would
have been, at most, evidence of negligence, which is insufficient to raise a
genuine dispute as to improper motive or means. 
See Cutting Edge, 103 Mass. App. Ct. at 754 (in order to establish
"improper" conduct for purposes of tortious interference claim,
"[i]t is not sufficient to show that the advisor was negligent, or made
negligent or even grossly negligent misrepresentations").  See also Restatement (Second) of Torts
§ 772 comment c ("If the[] conditions [for honest advice] are
present, it is immaterial that the [advisor] . . . dislikes the third
person and takes pleasure in the harm caused to him by the advice").  In fact, where the record demonstrates that
JRA was providing advice for a legitimate business purpose -- selecting a
responsible bidder for a municipal construction project -- JRA's negative
impression of B.C., based on its prior experience working with B.C. on a
municipal construction project, was highly relevant.  Cutting Edge, supra at 755 (improper motive
requires "an intent specifically to harm the plaintiff, unrelated to any
legitimate business purpose"). 
Accordingly, JRA's prior negative experience with B.C. does not create a
genuine issue of material fact as to whether JRA failed to provide "honest
advice within the scope of a request for the advice."  See Restatement (Second) of Torts § 772.[8]  Accordingly, JRA was entitled to summary
judgment as to the claim of intentional interference with advantageous business
relations.
      b. 
Defamation.  "To prevail on a
claim for defamation, a plaintiff must establish that (1) the defendant
published a defamatory statement of and concerning the plaintiff; (2) the
statement was a false statement of fact (as opposed to opinion); (3) the
defendant was at fault for making the statement, and any privilege that may
have attached to the statement was abused; and (4) the plaintiff suffered
damages as a result, or the statement was of the type that is actionable
without proof of economic loss." 
Lawless v. Estrella, 99 Mass. App. Ct. 16, 18-19 (2020).
      B.C. again focuses on this statement from
the Cambridge report:  "It appears
that many of [B.C.'s] recently completed projects may have required formal
dispute resolution (including mediation and litigation) in order to complete
the project."  JRA argues that
B.C.'s defamation claim fails for several reasons, including that the
common-interest privilege protects JRA from liability.  We agree.
      "Massachusetts courts have recognized
that a person may possess a conditional privilege to publish defamatory
material if the publication is reasonably necessary to the protection or
furtherance of a legitimate business interest" (citation omitted).  Kilnapp Enters., Inc. v. Massachusetts State
Auto. Dealers Ass'n, 89 Mass. App. Ct. 212, 218 (2016).  "[A] publication will be deemed
conditionally privileged if the publisher of the statement and the recipient
have a common interest in the subject and the statement is reasonably
calculated to further or protect that interest" (quotation and citation
omitted).  Downey v. Chutehall Constr.
Co., 86 Mass. App. Ct. 660, 666 (2014). 
The privilege does not apply if there is evidence that the publisher
either "(1) acted out of malice, (2) knew the information was
false, (3) had no reason to believe the information to be true,
(4) acted in reckless disregard of the truth or the defendant's rights, or
(5) published the information unnecessarily, unreasonably, or
excessively."  Id. at 667.  "Negligence is not enough to cause the
loss of the privilege."  Id.  To establish recklessness, "[t]here must
be sufficient evidence to permit the conclusion that the defendant in fact
entertained serious doubts as to the truth of his publication" (citation
omitted).  Id.  "Where, as here, a defendant in a
defamation action establishes the existence of a privilege, the burden rests
upon the plaintiff to raise a trial-worthy issue of an abuse of that
privilege."  Id. at 665.
      We agree with the judge that "[t]he
record contains no evidence from which the court may infer that JRA
'entertained serious doubts as to the truth of' the statement at
issue."  See Downey, 86 Mass. App.
Ct. at 667 ("Recklessness is a difficult standard to meet").  Indeed, as discussed supra, JRA reported that
its statement that B.C.'s "recently completed projects may have required
formal dispute resolution" was based on reference checks with B.C.'s prior
municipal clients.  This information
supports the judge's conclusion that there is no genuine dispute that JRA made
the allegedly defamatory statement in good faith, fulfilling its professional
obligation to its municipal client and furthering their common interest in
selecting a responsible bidder.  B.C.
produced no evidence demonstrating that JRA should have doubted the honesty and
accuracy of those references, which were provided by B.C. itself as part of the
bidding process.  There can be no doubt
that a municipality selecting a contractor for a construction project would
have an interest in knowing the contractor's recent history of seeking payment
for similar projects through dispute resolution, including litigation and
mediation.  See Lawless, 99 Mass. App.
Ct. at 23-24 (statements made by defendant in response to request to assess
plaintiff's job performance as town treasurer fell within conditional
privilege).  Because JRA's statement was
privileged, the judge properly allowed JRA's motion for summary judgment on
B.C.'s defamation claim.
Judgment
affirmed.
 
footnotes
 
[1] "We
summarize the evidence in the summary judgment record in the light most
favorable to [B.C.], the nonmoving party." 
Adams v. Schneider Elec. USA, 492 Mass. 271, 274 (2023).
 
[2] Under
G. L. c. 149, § 44A (2) (C), certain construction
projects by public agencies "shall be awarded to the lowest responsible
and eligible general bidder on the basis of competitive bids."  Under G. L. c. 149,
§ 44A (1), being a "[r]esponsible" bidder means
"possessing the skill, ability and integrity necessary to faithfully
perform the work called for by a particular contract, based upon a
determination of competent workmanship and financial soundness in accordance
with the provisions of [G. L. c. 149, § 44D]."
 
[3] The Attorney
General's fair labor division provides guidance to municipalities and other
interested parties on compliance with public bidding laws.  See Office of the Attorney General, Public
Bidding, https://www.mass.gov/public-bidding [https://perma.cc/YCC7-A79V].
 
[4] There is no
indication in the record that Vertex continued to serve as the OPM for this
second round of bids.
 
[5]
"Improper means include violation of a statute or common-law precept,
e.g., by means of threats, misrepresentation, or defamation."  Cavicchi, 67 Mass. App. Ct. at 658.  B.C. does not allege JRA violated a
statute.  We address its claim of
defamation, and the related allegation that JRA misrepresented B.C.'s business
practices, below.    
 
[6] To the extent
that B.C.'s bids were accepted on municipal projects where JRA was not the
architect, that is irrelevant to whether JRA provided honest advice on projects
where it was the architect.
 
[7] There is no
record support for B.C.'s claim that JRA treated it "more severely than
other contractors" by "withholding clear positive references, and
outright misrepresenting others."
 
[8] In the
context of taxpayer-funded public construction projects, such as this one, a
narrow reading of the honest advice rule would be contrary to the public interest,
as it could discourage architects and OPMs, hired by municipalities to evaluate
the responsibility of bidders, from sharing critical reports that may
articulate a justifiable reason to reject a bid or bidder.